In the Matter of the Amended Administrative Penalty Order Issued to Paul S. DOUGHERTY, III for Metal Coating Company and MCM Industries, Incorporated.

No. C8–91–1134.

Court of Appeals of Minnesota.

March 17, 1992.

Review Denied June 10, 1992.

486

Thomas D. Jenson, Duncan McCampbell, Lind, Jenson & Sullivan, P.A., Minneapolis, for relator.

Hubert H. Humphrey, III, Atty. Gen., Keith S. Moheban, Special Asst. Atty. Gen., St. Paul, for respondent.

Considered and decided by NORTON, P.J., and RANDALL, and CRIPPEN, JJ.

## OPINION

CRIPPEN, Judge.

Relators, MCM Industries Incorporated and Paul S. Dougherty, III, seek review of an administrative penalty order issued by the Commissioner of the Minnesota Pollution Control Agency. Relators claim that the Commissioner erred in establishing liability and assessing penalties.

## FACTS

In early 1990, MCM Industries operated a metal galvanizing business in Minneapolis. As part of its operations, MCM galvanized steel with zinc, a process involving the use of large quantities of sulfuric acid. The company also used hazardous materials in conducting a commercial painting operation.

Dougherty is the principal MCM shareholder and has served as the company's president since 1982. In addition, Dougherty was in charge of the plant's container labelling, plant safety and employee training programs. Dougherty was also the primary emergency coordinator in the event of a hazardous waste release, the primary contact person with all regulatory bodies concerning hazardous waste, and by his admission, the person ultimately in charge of operations at the facility.

In February 1990, the MPCA received a citizen's complaint concerning management of MCM's hazardous waste and the working conditions inside the plant. As a result, the state agency conducted an inspection of the plant on February 13, 1990.

Inspectors discovered large pools of liquid covering the floor of the room where metal was cleansed in acid baths. They ascertained that the liquid had a pH of zero, indicating its extremely high acidity and calling for its classification as a corrosive hazardous waste. Minn.R. 7045.0131, subp. 4 (1989). The inspectors observed that employees were continually travelling through the acid and tracking the material out of the building. In addition, the inspectors discovered that the cement floor of the building was severely pockmarked and the base of the building's metal siding was seriously corroded. The inspectors also noticed an unlabelled container of waste. An MCM employee identified the waste as paint related but acknowledged that the waste had not been evaluated to determine its composition. Finally, the inspectors reviewed the plant's hazardous waste emergency contingency plan and determined that the plan had not been updated to address the waste from the commercial painting operation and the fact that the person listed as the emergency coordinator no longer worked for MCM.

Afterwards, the inspectors met with Dougherty and notified him that the acid pools constituted a hazardous waste which needed proper management. The inspectors also told him about the unlabelled waste paint container and the deficient contingency plan and informed him the problems had to be corrected.

Dougherty told the inspectors that the acid pools resulted from a malfunctioning ventilation system which caused vaporized acid to condense and pool on the floor. Dougherty also told the inspectors that MCM was installing a new ventilation system which would eliminate the pooling by April 1990. In the interim, the company attempted to reduce the condensation problem by placing space heaters in the building. In addition, Dougherty claimed that the condensed liquid on the floor was recovered through the use of squeegees and placed back into the acid tanks.

The MPCA did not immediately proceed against MCM for the violations. Instead, the agency chose to see if the new ventilation system would mitigate the problem.

On June 28, 1990 the MPCA conducted a second investigation of MCM's facility. When the investigators arrived they discovered that there had been no improvements since the February inspection: Pools of acid remained on the floor, the waste paint container was not properly labeled and had not been analyzed, and the company's contingency plan had not been updated. The inspectors met with Dougherty and again informed him of their findings and the specific violations.

The MPCA Commissioner issued an administrative penalty order to MCM and Dougherty in September 1990. The order stated that MCM failed to report and recover spills in violation of Minn.R. 7045.0275, subps. 2 & 3 (1989), failed to properly maintain and operate a facility in violation of Minn.R. 7045.0566, subp. 2 (1989), failed to properly label a hazardous waste container in violation of Minn.R. 7045.0292, subp. 1 (1989), failed to properly amend the company's contingency plan in violation of Minn.R. 7045.0572, subp. 6 (1989), failed to properly evaluate waste materials in violation of Minn.R. 7045.0214, subps. 1 & 2 (1989), and failed to notify the agency of a spill and avoid water pollution in violation of Minn.Stat. § 115.061 (1990). The order required corrective actions and imposed a nonforgivable $10,000 penalty.

Both relators contested the order and requested an administrative hearing pursuant to Minn.Stat. § 116.072, subd. 6(a) (1990). Following a hearing, the administrative law judge concurred with the majority of the Commissioner's findings but recommended that the Commissioner recalculate the penalty to reflect a less serious violation.

On May 28, 1991, the Commissioner issued an amended order adopting portions of the judge's suggestions. The amended order declared the liability of both relators, included an order for corrective action, and reduced the nonforgivable penalty to $7075.

## ISSUES

1. Can relator Dougherty be held personally liable for these violations?

2. Does the record contain substantial evidence supporting the Commissioner's conclusion that the pooled liquid was a waste material, not substances reused in a "continuing process?"

3. Did the Commissioner err by finding occurrence of repeat violations?

## ANALYSIS

■ Agencies are not bound by a hearing examiner's findings and are free to make their own findings when supported by the record. *Hymanson v. City of St. Paul*, 329 N.W.2d 324, 326–27 (Minn.1983). These factual findings will be affirmed if supported by substantial evidence. *City of Moorhead v. Minnesota Pub. Utils. Comm'n*, 343 N.W.2d 843, 846 (Minn.1984); Minn.Stat. § 14.69(e) (1990). However, we must independently review the agency's decisions concerning questions of law, *Ekstedt v. Village of New Hope*, 292 Minn. 152, 164, 193 N.W.2d 821, 829 (1972), and issues of statutory interpretation. *Arvig Tel. Co. v. Northwestern Bell Tel. Co.*, 270 N.W.2d 111, 114 (Minn.1978).

1. Personal Liability of Relator Dougherty

■ A corporate officer may be held liable for hazardous waste violations if the officer personally participates in the wrongful, injury producing act. *United States v. Wade*, 577 F.Supp. 1326, 1341 (E.D.Pa.1983). However, the evidence must show that the individual either directs or participates in the violations. *Id.* at 1342; *Morgan v. Eaton's Dude Ranch*, 307 Minn. 280, 283, 239 N.W.2d 761, 762–63 (1976). Dougherty correctly asserts there is insufficient evidence that he directly participated in the alleged violations.

While there is ample evidence to establish that Dougherty personally participated in corporate affairs, the record does not contain sufficient evidence to conclude that Dougherty directed other employees to sweep hazardous materials outside the building or ignore environmental regulations. There is no evidence Dougherty personally placed hazardous materials into the environment. The Commissioner's finding that Dougherty personally participated in the violations was erroneous.

■ However, Dougherty's personal liability is not premised solely on his personal participation in the violations. The Commissioner contends that even if Dougherty did not participate directly in the violations, he is liable under the "responsible corporate officer" doctrine. This doctrine imposes liability on parties due to their responsible relationship to a violation. *United*

*States v. Park*, 421 U.S. 658, 672–73, 95 S.Ct. 1903, 1911–12, 44 L.Ed.2d 489 (1975); *United States v. Dotterweich*, 320 U.S. 277, 284–85, 64 S.Ct. 134, 138, 88 L.Ed. 48 (1943).

The *Park* Court described the emerging liability of responsible corporate agents:

> The liability of managerial officers did not depend on their knowledge of, or personal participation in, the act made criminal by the statute. Rather, where the statute under which they were prosecuted dispensed with "consciousness of wrongdoing," an omission or failure to act was deemed a sufficient basis for a responsible corporate agent's liability. It was enough in such cases that, by virtue of the relationship he bore to the corporation, the agent had the power to prevent the act complained of.

*Park*, 421 U.S. at 670–71, 95 S.Ct. at 1911. The Court concluded that because the jury found the corporate officer had a responsible relationship to the violations and because he had the power and the responsibility to address the violations, he could be held criminally liable for violations which he did not actually commit. *Id.* 421 U.S. at 673–74, 95 S.Ct. at 1912.

We determine in the instant case: (1) the responsible corporate officer doctrine applies to the statutes and regulations at issue, and (2) relator Dougherty can be held liable under an application of the doctrine.

 The responsible corporate officer doctrine applies to public welfare offenses which impose strict liability by plain language and intent. *Id.* 421 U.S. at 672, 95 S.Ct. at 1911; *Dotterweich*, 320 U.S. at 284–85, 64 S.Ct. at 138. A public welfare offense occurs where a statute is intended to improve the common good and the legislature eliminates the normal requirement for culpable intent, resulting in strict liability for all those who have a responsible share in the offense. *Park*, 421 U.S. at 672–73, 95 S.Ct. at 1911–12; *Morissette v. United States*, 342 U.S. 246, 259–60, 72 S.Ct. 240, 248, 96 L.Ed. 288 (1952); *Dotterweich*, 320 U.S. at 284–85, 64 S.Ct. at 138; *United States v. Balint*, 258 U.S. 250,

254, 42 S.Ct. 301, 303, 66 L.Ed. 604 (1922). We conclude the responsible corporate officer doctrine applies to the laws at issue in this case.

Minnesota's hazardous waste laws constitute a public welfare statute because they pervasively affect activities which threaten human health and safety as well as the environment. *See United States v. Hayes Int'l Corp.*, 786 F.2d 1499, 1503 (11th Cir.1986) (characterizing federal hazardous waste law, Resource Conservation and Recovery Act (RCRA), as public welfare statute); *United States v. Johnson & Towers, Inc.*, 741 F.2d 662, 666 (3d Cir. 1984) (characterizing RCRA as public welfare statute), *cert. denied*, 469 U.S. 1208, 105 S.Ct. 1171, 84 L.Ed.2d 321 (1985). In addition, the violations alleged are strict liability offenses. *See* Minn.Stat. § 116.-072, subd. 1 (1990) (no requirement of "knowledge" or "willfulness"); *see also United States v. Liviola*, 605 F.Supp. 96, 100 (N.D. Ohio 1985) (similar provisions in RCRA are "strict liability offenses not requiring proof of willful intent").

The responsible corporate doctrine is appropriate in the context of environmental laws:

> Imposing liability upon only the corporation, but not those corporate officers and employees who actually make corporate decisions, would be inconsistent with [the legislature's] intent to impose liability upon the persons who are involved in the handling and disposal of hazardous substances.

*United States v. Northeastern Pharmaceutical & Chem. Co.*, 810 F.2d 726, 745 (8th Cir.1986), *cert. denied*, 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987); *cf. Park*, 421 U.S. at 672, 95 S.Ct. at 1911 (requirements placed on corporate officers may be demanding or even onerous, yet are "no more stringent than the public has a right to expect of those who voluntarily assume positions of authority in business"). In addition, imposing liability on corporate officers is especially appropriate in the civil context. *See United States v. Hodges X-Ray, Inc.*, 759 F.2d 557, 561 (6th Cir.1985) (rationale for holding corporate officers re-

sponsible for acts of the corporation is "even more persuasive where only civil liability is involved").

■■■ Three essential elements must be satisfied before liability will be imposed upon a corporate officer under the responsible corporate officer doctrine: (1) the individual must be in a position of responsibility which allows the person to influence corporate policies or activities; (2) there must be a nexus between the individual's position and the violation in question such that the individual could have influenced the corporate actions which constituted the violations; and (3) the individual's actions or inactions facilitated the violations. *Park*, 421 U.S. at 673–74, 95 S.Ct. at 1912; *see Dotterweich*, 320 U.S. at 284, 64 S.Ct. at 138 (offense is committed by all who "have such a responsible share in the furtherance of the transaction which the statute outlaws").

This case presents facts strikingly similar to *Park*. In *Park* the president of a large national food store chain was convicted of causing adulterated food to be transported and sold in interstate commerce in violation of the Federal Food, Drug and Cosmetic Act. *Park*, 421 U.S. at 660–61, 95 S.Ct. at 1906. In addition to being the corporation's president, Park was responsible for the entire operation of the company and had received notice of unsanitary conditions at one of the company's warehouses. *Id.* 421 U.S. at 662–63, 95 S.Ct. at 1906–07. At trial, Park acknowledged that the system for keeping food sanitary was not working "properly", but also stated that he was doing everything he could to remedy the violation. *Id.* 421 U.S. at 663, 95 S.Ct. at 1907. The Court upheld Park's conviction even though he did not personally participate in the contamination of the food because Park had a responsible relationship to the violations and because Park had not prevented or corrected the violations. *Id.* 421 U.S. at 673–74, 95 S.Ct. at 1912.

Relator Dougherty must be similarly accountable. First, he was in a position of responsibility as president and primary emergency coordinator. Second, the viola-

tions at issue were clearly within his sphere of influence and involvement. Dougherty was the primary contact with all regulatory bodies concerning hazardous waste and the person ultimately in charge of operations at the facility.

Finally, Dougherty failed to prevent the violations and take proper corrective action once the violations occurred. The evidence is undisputed that Dougherty was aware of the acid pooling on the floor and that the acidity of the substance made it hazardous. Dougherty was aware that employees and equipment tracked the material out of the facility. Dougherty's only response to these violations was his statement that the problem was caused by a building contractor's error and that MCM expected to correct the problem in the future. This claim of attempted compliance is unavailing. *See Liviola*, 605 F.Supp. at 100 (defendant's professed lack of intent to violate the law is irrelevant in strict liability context). Dougherty was also aware of the unlabelled waste paint container and the unamended contingency plan, yet he did nothing to remedy these violations.

Dougherty argues that an imposition of personal liability through use of the responsible corporate officer doctrine is tantamount to vicarious liability. However, as the *Park* Court noted, a corporate officer will not be held liable solely because of the individual's position within the corporation. *Park*, 421 U.S. at 674, 95 S.Ct. at 1912. As outlined above, Dougherty is personally liable because he satisfied all three elements of the doctrine, not merely because he is president of MCM.

■■■ Dougherty next contends that he should not be held liable because the Commissioner has not presented sufficient evidence to "pierce the corporate veil." *See Victoria Elevator Co. v. Meriden Grain Co.*, 283 N.W.2d 509, 512 (Minn.1979) (necessary elements for piercing corporate veil). This argument is also unfounded because the record demonstrates that the Commissioner never sought to penalize Dougherty solely because of his status as a stockholder or officer of the corporation. *See United States v. Mottolo*, 605 F.Supp.

898, 913 n. 17 (D.N.H.1985) (defendant's attempt to argue defective pleading on issue of piercing corporate veil without merit where prosecutor did not claim misuse of corporate form or rely on piercing of the corporate veil). The Commissioner was not required to "pierce the corporate veil" before holding Dougherty personally liable. *See Northeastern Pharmaceutical,* 810 F.2d at 744 (personal liability is distinct from derivative liability that results from piercing corporate veil); *New York v. Shore Realty Corp.,* 759 F.2d 1032, 1052 (2d Cir.1985) (corporate officer may be held personally responsible without piercing corporate veil).

■ Finally, Dougherty attempts to eliminate personal liability by claiming that because neither "corporate officer" nor "shareholder" is specifically mentioned in the definition of "person," he cannot be subject to the administrative penalty order. This argument is also unconvincing. Minn. Stat. § 116.06, subd. 8 (1990) provides the relevant definition of person:

> Any human being, any municipality or other governmental or political subdivision or other public agency, any public or private corporation, any partnership, firm, association, or other organization, any receiver, trustee, assignee, agent, or other legal representative of any of the foregoing, or any other legal entity, but does not include the pollution control agency.

This is a singularly encompassing definition. *See United States v. Brittain,* 931 F.2d 1413, 1418 (10th Cir.1991) (similar definition of "person" in Clean Water Act clearly includes individuals); *Johnson & Towers,* 741 F.2d at 665 (RCRA definition of "person" is expansive). Dougherty is a "person" within the context of this enforcement action.

### 2. Continuing Process Exception

■ Relators vigorously argue that the alleged violations could not have occurred because the pools of acid were not "hazardous waste," as defined by the regulations at issue.[1] Relators contend that the pools of acid were part of a "continuing process" where the condensed liquid was returned to the acid baths through the use of squeegees.

The "continuing process" exception from the definition of waste was discussed at length in *American Mining Congress v. EPA,* 824 F.2d 1177 (D.C.Cir.1987). The court concluded that the federal hazardous waste law, RCRA, did not extend to spent materials that are being recycled or reused in an ongoing manufacturing process. *Id.* at 1186. The court specifically stated:

> These materials have not yet become part of the waste disposal problem; rather, *they are destined for beneficial reuse or recycling in a continuous process by the generating industry itself.*

*Id.* (emphasis in original).

While hazardous materials that are part of a continuing process should not be classified as waste, the substantial evidence in the instant case indicates that the pools of sulfuric acid were not part of a viable "continuous process."[2] Moreover, even if there was an attempt at reclaiming the materials, the reclamation system was inadequate and materials escaped, endangering the environment. Unlike *American Mining,* the materials in this case became

---

1. We note that relators' argument does not address the flaws in the company's contingency plan or the failure to properly analyze and label the waste paint container.

2. The record reflects that: (1) vehicles and employees tracked acid outside of the building where materials were not recovered; (2) it is questionable whether recovery of acid through the use of squeegees is feasible; (3) the investigators did not see any evidence of reclamation or reuse (4) the investigators did not see any equipment (e.g., squeegees) which could facilitate recovery and reuse of the pooled acid; (5) an employee told investigators that past practice included sweeping the pooled liquids outside of the facility; (6) the deterioration of the building's metal siding and concrete floor indicated that a significant amount of the acid had not been reclaimed; (7) there was still acid pooled on the floor after the company ceased operations; (8) there was visible staining of the concrete and gravel on the outside of the structure; and (9) there was no containment system for the acid once it had escaped from the acid tanks.

part of the waste disposal problem and were properly subject to the coverage of Minnesota's hazardous waste laws.

### 3. Assessment of Penalties

 Relators' third contention of error focuses on the Commissioner's claim that relators were repeat violators and deserved an enhanced penalty. Minn.Stat. § 116.072 subd. 2(c) (1990) allows consideration of four additional factors when a violation is a "violation after an initial violation." For the repeat violation portion of Minn.Stat. § 116.072, subd. 2(c) to be applied, there only needs to be one previous violation.[3]

Relators argue that because the MPCA did not issue a formal written citation in February, the Commissioner should be barred from using the February inspection results as evidence of a past violation. We disagree with this argument. The record reveals that there were documented violations present in both February and June. Moreover, the statute does not require previous written citations, convictions, or successful prosecutions, only previous violations.[4]

### 4. Other Issues

 Relators claim the Commissioner erred by amending the administrative law judge's findings to require the completion of corrective actions. We disagree because the Commissioner has the power to impose corrective actions, Minn.Stat. § 116.072, subd. 4 (1990), and relators had a full and fair opportunity to challenge the order. More importantly, even if enforcement of the order may be impossible due to the fiscal impairment of relators, this fact does not affect the initial determination that a party is liable. Persons do not escape the consequences of generating hazardous waste simply by going out of business.

 Relators also challenge the Commissioner's calculation of the penalty and the Commissioner's assessment of the violations as "willful." Relators argue that there was minimal environmental impact and that they spent their last dollar on environmental compliance and therefore they should not be harshly penalized. These arguments are without merit because there is substantial evidence to support the Commissioner's characterization of the offenses and assessment of penalties. The fact that the Commissioner could not quantify the amount of acid that had entered the environment does not lessen the severity of the offense. The seriousness of a violation is measured against the potential for harm, not the actual damage.[5] Moreover, we find that the record contains substantial evidence of MCM's intentional disregard or plain indifference to the law, supporting the Commissioner's assessment of penalties. *See Western Waterproofing Co. v. Marshall,* 576 F.2d 139, 142 (8th Cir.) (a willful violation is an act done voluntarily with either an intentional disregard of or plain indifference to statutory requirements), *cert. denied,* 439 U.S. 965, 99 S.Ct. 452, 58 L.Ed.2d 423 (1978).

### DECISION

We affirm the Commissioner's amended administrative penalty order and hold that both MCM and Dougherty are liable for the corrective actions and penalty assessment.

Affirmed.

---

**3.** Of course, the number of previous violations is a factor to be considered in evaluating the seriousness of an offense. Minn.Stat. § 116.-072, subd. 2(c)(3).

**4.** We need not address relators' concerns relating to pre–1990 violations because the penalty calculation worksheet contained in the record reveals that the Commissioner only considered the 1990 violations in calculating the penalty.

**5.** The applicable definition of "disposal" demonstrates the focus of the statute is on the release of the substance, not the quantity. Minn.Stat. § 115A.03, subd. 9 (1990) ("disposal" governs discharge of "any waste" including "any constituent thereof" which may pollute environment); *see also* Minn.R. 7045.0275, subps. 2 & 3 (duties to report and recover do not have minimum threshold before action is mandated—if hazardous waste "may" cause any amount of pollution duties are triggered).