VINCENT D. CELENTANO ET AL. *v.* ARTHUR
J. ROCQUE, JR., COMMISSIONER
OF ENVIRONMENTAL
PROTECTION, ET AL.
(SC 17703)

Borden, Norcott, Katz, Palmer and Zarella, Js.

Argued February 13—officially released June 12, 2007

*Michael J. Brandi*, with whom was *John A. Acampora*, for the appellants (plaintiffs).

*Patricia A. Horgan*, assistant attorney general, with whom were *David H. Wrinn*, assistant attorney general, and, on the brief, *Richard Blumenthal*, attorney general, and *Kimberly P. Massicotte*, assistant attorney general, for the appellees (defendants).

*Opinion*

BORDEN, J. The plaintiffs,[1] Vincent D. Celentano, Cel-Mor Investments, Inc. (Cel-Mor), and Vincent D. Celentano doing business as Cel-Mor Investments, Inc., appeal[2] from the judgment of the trial court dismissing their administrative appeal from the decision of the named defendant,[3] Arthur J. Rocque, Jr., commissioner of environmental protection (commissioner). The plaintiffs contend that the trial court improperly determined that the commissioner properly: (1) had acted within his statutory authority; (2) had declined to impose liability against certain easement holders; and (3) had assigned liability to Celentano in his individual capacity. We affirm the judgment of the trial court.

[1] Although the appeal form lists only Vincent D. Celentano as an appellant, the appellants' briefs and docketing statement were filed on behalf of Vincent D. Celentano, Cel-Mor Investments, Inc., and Vincent D. Celentano doing business as Cel-Mor Investments, Inc. Practice Book § 63-4 (4) (A) requires the appellant to list "the names . . . of all parties to the appeal . . . ." In light of this conflict, and in light of the absence of any indication that the claims of Cel-Mor Investments, Inc., and Vincent D. Celentano doing business as Cel-Mor Investments, Inc., were intended to be severed from Vincent D. Celentano's individual claim, we consider Vincent D. Celentano, Cel-Mor Investments, Inc., and Vincent D. Celentano doing business as Cel-Mor Investments, Inc., as the appellants, and we refer to them as the plaintiffs in this opinion.

[2] The plaintiffs appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[3] The plaintiffs also have named the department of environmental protection (department) as a defendant in this appeal.

The commissioner issued an order directing the plaintiffs to remedy deficiencies in a dam and associated detention basin located in Naugatuck. The plaintiffs appealed from that order to the trial court, which dismissed the plaintiffs' appeal. This appeal followed.

The record reveals the following relevant facts and procedural history. In 1979, Celentano obtained approval from the borough of Naugatuck (borough) to construct a 288 lot residential subdivision called the Ridge. Due to land clearing and construction activities at the Ridge, in 1983, an abutting landowner, William Woermer, suffered damage to his property from flooding and sediment. In February of that year, Celentano conveyed the Ridge, by quitclaim deed, to Ridge Development, Inc. (Ridge Development). That August, the commissioner ordered (1983 order) Celentano and Ridge Development to install and maintain "all necessary measures to control erosion and sedimentation . . . [and] to minimize further erosion and [storm water runoff] onto adjacent properties." Celentano negotiated a resolution of that order, proposing the construction of a dam and detention basin on other property that he owned located adjacent to the Ridge. Also, in 1983, Woermer brought an action against Celentano and Ridge Development for real and personal property damage sustained due to flooding. That case was settled with Ridge Development's insurer. Thereafter, Celentano had plans of the proposed dam prepared, and he executed an easement granting Ridge Development and the borough the right to maintain the dam, the construction of which was completed in 1984.

Subsequent to the dam's completion, engineers hired by Woermer concluded that it was undersized and that its drainpipe was inadequate. They predicted that the dam would overtop during a ten year storm event and that, if the dam were to fail, several houses would be subject to a sudden, massive flood. In November, 1986,

Celentano met with the commissioner, engineers for Ridge Development, the borough and Woermer to discuss possible remedies. In February, 1987, the commissioner ordered Ridge Development (1987 order) to make improvements and alterations to the structure and its drainage system. In negotiations related to that order, Celentano represented that Ridge Development was the owner of the dam, but he indicated that he had authority to resolve the order on Ridge Development's behalf. At the time, however, he still was the owner of the dam. Two months after the commissioner issued the 1987 order, Celentano transferred the property, including the dam, to Cel-Mor.

At some point after the issuance of the 1987 order, Ridge Development installed a device on the dam to limit downstream flooding. The commissioner subsequently concluded, however, that this modification caused the spillway to operate more often, which placed the dam in an unsafe condition even more frequently. Because Ridge Development ultimately had failed to comply with the 1987 order, the commissioner commenced a civil enforcement action against it in February, 1990. Two years later, Ridge Development and the commissioner entered into a stipulated judgment.[4] Despite that agreement, Ridge Development took no further action to repair the dam.

Meanwhile, neighbors continued to observe water in the dam's detention basin crest during heavy precipitation. In response to their complaints, the commissioner inspected the property. He found that the dam embankment is saturated with water, seepage occurs at its base, its crest is uneven, and it shows signs of depressions. In addition, embankment soils and materials are insuffi-

---

[4] Under the terms of that agreement, Ridge Development was required to pay a civil penalty of $50,000 and to comply with the commissioner's final decision regarding the 1987 order.

ciently compacted. On the basis of his findings and the proximity of the dam to neighboring properties, the commissioner concluded that the dam's failure could result in the loss of life and significant property damage.

Accordingly, in February, 2002, the commissioner issued the order underlying this appeal (2002 order). Pursuant to General Statutes § 22a-402,[5] he required the plaintiffs: (1) to retain a licensed and qualified engineer; (2) to submit and implement an emergency operations plan; (3) to submit a study investigating the condition of the dam, detention basin and downstream drainage system; (4) to submit an investigation report for the commissioner's review and approval; and (5) to submit a plan to place the structure in a safe condition, appropriately discharging storm water from the Ridge without flooding adjacent properties. Thereafter, the plaintiffs requested a hearing, under General Statutes § 22a-408,[6] to contest the order. After that hearing, the commissioner issued his final decision. In the decision, he stated that "[t]he record amply demonstrates the [plaintiffs] are persons who either own or have control of an unsafe dam and the requirements of the order are reasonable and necessary to place the dam in a safe condition." The plaintiffs, having exhausted their administrative remedies, appealed to the trial court pur-

---

[5] General Statutes § 22a-402 provides in relevant part: "The Commissioner of Environmental Protection shall investigate and inspect or cause to be investigated and inspected all dams or other structures which, in his judgment, would, by breaking away, cause loss of life or property damage. . . . If, after any inspection described herein, the commissioner finds any such structure to be in an unsafe condition, he shall order the person owning or having control thereof to place it in a safe condition or to remove it and shall fix the time within which such order shall be carried out. . . ."

[6] General Statutes § 22a-408 provides in relevant part: "Upon written request, any person aggrieved by any decision of the commissioner under this chapter . . . shall be given a hearing by the commissioner. . . . The commissioner shall conduct such hearing promptly in accordance with the provisions of chapter 54. An appeal may be taken from any decision of the commissioner in accordance with the provisions of section 4-183 . . . ."

suant to General Statutes § 4-183[7] of the Uniform Administrative Procedure Act (UAPA), General Statutes § 4-166 et seq.

In the trial court, the plaintiffs claimed that the commissioner had exceeded his authority and jurisdiction because he had encroached upon the statutory authority of the borough, and because the commissioner neither had issued his 2002 order as part of a periodic inspection nor had presented evidence that the dam had been breached or that its capacity had been exceeded, as required by § 22a-402. The plaintiffs also claimed that, because Celentano had granted Ridge Development and the borough an easement to maintain the dam and because the commissioner, in previous orders, had treated Ridge Development as the dam's owner, the plaintiffs neither controlled nor maintained the dam and, therefore, had no duty to remedy its defects. Finally, pursuant to the responsible corporate officer doctrine adopted by this court in *BEC Corp.* v. *Dept. of Environmental Protection*, 256 Conn. 602, 775 A.2d 928 (2001), they argued that the commissioner improperly had directed the 2002 order to Celentano

[7] General Statutes § 4-183 provides in relevant part: "(a) A person who has exhausted all administrative remedies available within the agency and who is aggrieved by a final decision may appeal to the Superior Court as provided in this section. . . .

"(j) The court shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact. The court shall affirm the decision of the agency unless the court finds that substantial rights of the person appealing have been prejudiced because the administrative findings, inferences, conclusions, or decisions are: (1) In violation of constitutional or statutory provisions; (2) in excess of the statutory authority of the agency; (3) made upon unlawful procedure; (4) affected by other error of law; (5) clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record; or (6) arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion. If the court finds such prejudice, it shall sustain the appeal and, if appropriate, may render a judgment under subsection (k) of this section or remand the case for further proceedings. For purposes of this section, a remand is a final judgment. . . ."

in his individual capacity. The trial court rejected the plaintiffs' claims and dismissed their appeal. This appeal followed.

"We begin by articulating the applicable standard of review in an appeal from the decision of an administrative agency. 'Judicial review of [an administrative agency's] action is governed by the [UAPA] . . . and the scope of that review is very restricted. . . . *New Haven* v. *Freedom of Information Commission*, 205 Conn. 767, 773, 535 A.2d 1297 (1988). With regard to questions of fact, it is neither the function of the trial court nor of this court to retry the case or to substitute its judgment for that of the administrative agency. *Griffin Hospital* v. *Commission on Hospitals & Health Care*, 200 Conn. 489, 496, 512 A.2d 199, appeal dismissed, 479 U.S. 1023, 107 S. Ct. 781, 93 L. Ed. 2d 819 (1986). Judicial review of the conclusions of law reached administratively is also limited. The court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. . . . Id. Although the interpretation of statutes is ultimately a question of law . . . it is the well established practice of this court to accord great deference to the construction given [a] statute by the agency charged with its enforcement. . . . Id. Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts. *New Haven* v. *Freedom of Information Commission*, supra, 774.' " *Cadlerock Properties Joint Venture, L.P.* v. *Commissioner of Environmental Protection*, 253 Conn. 661, 668–69, 757 A.2d 1 (2000), cert. denied, 531 U.S. 1148, 121 S. Ct. 1089, 148 L. Ed. 2d 963 (2001), quoting *State Board of Labor Relations* v. *Freedom of Information Commission*, 244 Conn. 487, 493–94, 709 A.2d 1129 (1998).

Courts grant an agency particular deference when it has expertise in a given area and a history of determining factual and legal questions similar to those at issue. *MacDermid, Inc.* v. *Dept. of Environmental Protection,* 257 Conn. 128, 137, 778 A.2d 7 (2001). Moreover, the legislature's use of a broad term in an administrative context, without attempting to define that term, "evinces a legislative judgment that the agency should define the parameters of that term on a case-by-case basis." *Cos Cob Volunteer Fire Co. No. 1, Inc.* v. *Freedom of Information Commission,* 212 Conn. 100, 106, 561 A.2d 429 (1989). "Cases that present pure questions of law, however, invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . We have determined, therefore, that the traditional deference accorded to an agency's interpretation of a statutory term is unwarranted when the construction of a statute . . . has not previously been subjected to judicial scrutiny [or to] . . . a governmental agency's time-tested interpretation . . . ." (Internal quotation marks omitted.) *Pasquariello* v. *Stop & Shop Cos.,* 281 Conn. 656, 663, 916 A.2d 803 (2007).

I

The plaintiffs first claim that the trial court improperly rejected their claim that the commissioner had exceeded his authority and jurisdiction. Specifically, the plaintiffs contend that § 22a-402 required the commissioner, as a prerequisite to issuing his 2002 order, to have conducted an inspection of the dam and, as a result of that inspection, have concluded that it was in an unsafe condition. They further contend that the commissioner had not complied with those requirements when he issued the 2002 order. We conclude, to the contrary, that the commissioner acted within the

scope of his statutory authority and, thus, within his jurisdiction.

"Administrative agencies . . . are tribunals of limited jurisdiction and their jurisdiction is dependent entirely upon . . . the statutes vesting them with power and they cannot confer jurisdiction upon themselves. . . . We have recognized that [i]t is clear that an administrative body must act strictly within its statutory authority, within constitutional limitations and in a lawful manner. . . . It cannot modify, abridge or otherwise change the statutory provisions . . . under which it acquires authority unless the statutes expressly grant it that power." (Internal quotation marks omitted.) *Fullerton* v. *Administrator, Unemployment Compensation Act*, 280 Conn. 745, 755, 911 A.2d 736 (2006). Our analysis, therefore, of whether the commissioner exceeded his authority or acted without jurisdiction, focuses on the relevant statutes.

"Whether the trial court properly concluded that the [commissioner] had jurisdiction . . . involves a legal question involving statutory interpretation, over which our review is plenary." *AvalonBay Communities, Inc.* v. *Inland Wetlands Commission*, 266 Conn. 150, 158–59, 832 A.2d 1 (2003). "When interpreting a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature." (Internal quotation marks omitted.) *Fullerton* v. *Administrator, Unemployment Compensation Act*, supra, 280 Conn. 755. "The meaning of a statute shall, in the first instance, be ascertained from the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extratextual evidence of the meaning of the statute shall not be considered." General Statutes § 1-2z. "[None of the parties] contends, however, that § 1-2z governs our review

of [§ 22a-402] as it applies to the facts of this case." *State* v. *Patterson*, 276 Conn. 452, 479 n.19, 886 A.2d 777 (2005). "Accordingly, our analysis is not limited, and we, therefore, apply our well established process of statutory interpretation, under which we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case . . . ." (Internal quotation marks omitted.) *Juchniewicz* v. *Bridgeport Hospital*, 281 Conn. 29, 35, 914 A.2d 511 (2007).

We begin our analysis with the language of the relevant statutes. The commissioner's power to regulate dams and reservoirs derives from chapter 446j of the General Statutes. General Statutes §§ 22a-401 through 22a-411. Section 22a-401 confers jurisdiction upon the commissioner, providing in relevant part: "All dams, dikes, reservoirs and other similar structures, with their appurtenances, without exception and without further definition or enumeration herein, which, by breaking away or otherwise, might endanger life or property, shall be subject to the jurisdiction conferred by this chapter. The Commissioner of Environmental Protection shall formulate all rules, definitions and regulations necessary to carry out the provisions of this chapter and not inconsistent therewith. . . ." The commissioner specifically issued the 2002 order pursuant to § 22a-402, which provides in relevant part: "The Commissioner of Environmental Protection shall investigate and inspect or cause to be investigated and inspected all dams or other structures which, in his judgment, would, by breaking away, cause loss of life or property damage. . . . The commissioner shall make or cause to be made such periodic inspections of all such structures as may be necessary to reasonably insure that they are maintained in a safe condition. If, after any inspection described herein, the commissioner finds any such structure to be in an unsafe condition, he shall

order the person owning or having control thereof to place it in a safe condition or to remove it and shall fix the time within which such order shall be carried out. . . ." See also Regs., Conn. State Agencies § 22a-39-4.3.a (providing that commissioner exclusively shall regulate construction or modification of any dam).

Section 22a-402, therefore, compels inspection under two scenarios. First, the commissioner must inspect dams that could cause loss of life or property damage upon their failure. General Statutes § 22a-402; see, e.g., *John A. Errichetti Associates* v. *Boutin*, 183 Conn. 481, 484–85, 439 A.2d 416 (1981). Second, the commissioner must make periodic inspections of *all* dams, regardless of the risk to life and property, reasonably to ensure their safety as well. General Statutes § 22a-402. The commissioner's failure to comply adequately with these inspection requirements, however, would not deprive him of the jurisdiction to remedy an unsafe condition of which he had become aware. In fact, § 22a-402 provides that "[i]f, after *any* inspection described herein, the commissioner finds any such structure to be in an unsafe condition, he shall order the person owning or having control thereof to place it in a safe condition . . . ." (Emphasis added.) The purpose of § 22a-402 is not, as an end in itself, to mandate the inspection of dams, but rather to require such inspections as a means to ensure the safety and integrity of those dams.

In the present case, the commissioner had inspected the dam on not less than twenty occasions and, as a result, had classified it as a "significant hazard dam," meaning that the dam's failure would result in a possible loss of life. The commissioner also had concluded that the dam was incapable of safely sustaining a 100 year storm event. In fact, he expressly incorporated these findings in the 2002 order, in which he stated that "[t]he dam would, by breaking away, cause loss of life or property damage" and that "[t]he dam is in an unsafe

condition." The plaintiffs point to no evidence in the record that would permit a contrary conclusion. Accordingly, we conclude that the commissioner satisfied the statutory requirement that, prior to issuing the 2002 order that the dam be placed in a safe condition, he had inspected the dam and had found it to be in an unsafe condition.

The plaintiffs argue that § 22a-402 required the commissioner to supply "evidence that the dam has been breached or that its capacity has ever been exceeded." We disagree. The plaintiffs mischaracterize the threshold determination that the statute requires the commissioner to make prior to issuing an order. The commissioner "shall investigate and inspect or cause to be investigated and inspected all dams or other structures which, in his judgment, would, by breaking away, cause loss of life or property damage. . . ." General Statutes § 22a-402. For obvious reasons, there would be no need to inspect a dam to determine the consequence of its failure if that failure already had occurred. Thus, the inspections provided for by that statute are prophylactic in nature. The plaintiff does not contest the commissioner's conclusions that, in its present condition, the dam can detain only a two year storm event, would fail in a ten year storm event and is incapable of passing a 100 year storm event. These findings are sufficient under § 22a-402 as threshold documentation of the *potential* for harm.

We are also unpersuaded by the plaintiffs' argument that General Statutes § 7-148,[8] which confers upon the

---

[8] General Statutes § 7-148 (c) provides in relevant part: "Any municipality shall have the power to do any of the following, in addition to all powers granted to municipalities under the Constitution and general statutes . . . .

"(6) . . . (B) . . . (i) Lay out, construct, reconstruct, repair, maintain, operate, alter, extend and discontinue sewer and drainage systems and sewage disposal plants . . . .

"(iii) Regulate the laying, location and maintenance of gas pipes, water pipes, drains, sewers, poles, wires, conduits and other structures in the streets and public places of the municipality . . . .

borough the authority to install a new drainage system, deprives the commissioner of the statutory authority to order the plaintiff to place the dam and its detention basin in a safe condition. Specifically, the plaintiffs argue that the 2002 order "ignores the fact that the borough must authorize the new drainage system and further overlooks the possibility that the borough may not issue the necessary permits for said drainage system . . . ." The plaintiffs have not identified an actual conflict between the 2002 order and the borough's municipal powers, however, because the order does not dictate the means by which remediation of the unsafe dam must transpire. Instead, that order requires the plaintiffs to submit a plan describing the proposed actions for placing the dam in a safe condition, including a "provision for the installation of a new drainage system and other improvements to the detention basin . . . ." The possibility that the plaintiffs may need municipal approval to comply with the commissioner's order may well add a layer of complexity and the potential for conflict, should the borough not authorize the proposed drainage system. It does not, however, affect the commissioner's authority under § 22a-402. See *Fullerton* v. *Administrator, Unemployment Compensation Act,* supra, 280 Conn. 755 (looking solely to enabling statute for scope of agency jurisdiction); see also *Shelton* v. *Commissioner, Dept. of Environmental Protection,* 193 Conn. 506, 517, 479 A.2d 208 (1984) (noting agency authority generally preempts municipal authority when two conflict).

Finally, the plaintiffs argue that "the 2002 order essentially dismantles the [department's] permit that was

"(C) . . . (iii) Control the excavation of highways and streets;

"(iv) Regulate and prohibit the excavation, altering or opening of sidewalks, public places and grounds for public and private purposes and the location of any work or things thereon, whether temporary or permanent, upon or under the surface thereof . . . ."

lawfully issued in 1983 . . . ." Beyond this conclusory assertion, the plaintiffs have cited no relevant authority for the proposition that the plaintiffs' compliance with the original permit would preclude the commissioner's subsequent enforcement of the dam safety statute. Therefore, this argument has been inadequately briefed and, accordingly, we decline to consider it. See, e.g., *Drabik* v. *East Lyme*, 234 Conn. 390, 401, 662 A.2d 118 (1995).

## II

The plaintiffs' second claim is that the trial court improperly rejected their claim that the commissioner's enforcement of the 2002 order against the plaintiffs was unlawful because Celentano, in 1983, had granted Ridge Development and the borough an easement for the maintenance of the dam. Thus, the plaintiffs contend that, because "[t]hrough that easement, Ridge Development and the [b]orough were responsible for the 'care and control' of the dam and the detention basin, pursuant to [§] 22a-402," the plaintiffs were not in control of the dam and the detention basin. We disagree.

The following additional facts are relevant to the disposition of this claim. As part of his negotiated resolution of the 1983 order, Celentano agreed to provide to the commissioner a certified copy of an easement, as it had been filed on the land records, which easement was to allow for Ridge Development and the borough to maintain the dam.[9] Celentano executed such an easement on November 3, 1983, and he submitted it to the

---

[9] The easement provides in relevant part: "Vincent D. Celentano . . . for the consideration of One Dollar ($1.00) and other valuable considerations, received to my full satisfaction of RIDGE DEVELOPMENT, INC., and the BOROUGH OF NAUGATUCK . . . a drainage easement and right to grade and construct a water retention basin over and upon . . . [a] portion of property owned by me . . . . Said easement shall be for the purpose of constructing, grading and maintaining a detention basin thereon and for all other purposes connected therewith to detain the flow of storm waters."

commissioner on November 7, 1983. He had not, however, recorded the easement on the land records at that time, and he did not do so until September, 2002, nearly nineteen years after the easement's execution and seven months after the commissioner had issued his 2002 order. As noted previously in this opinion, in negotiations related to the 1987 order, Celentano represented Ridge Development to be the owner of the dam, but he indicated that he had authority to resolve the order on Ridge Development's behalf. He did not reveal that he, in fact, owned the dam. After Ridge Development appealed the 1987 order, the plaintiff again appeared on Ridge Development's behalf at hearings related to that appeal. He failed to inform the hearing officer that he, not Ridge Development, had owned the property at the time of the 1987 order or that he recently had sold the subject property to Cel-Mor, its new owner. Accordingly, the 1987 order incorrectly stated that Ridge Development "is the owner and/or has the responsibility of maintaining the lower detention basin . . . ."

"It is well settled that '[a]n easement creates a non-possessory right to enter and use land in the possession of another and obligates the possessor not to interfere with the uses authorized by the easement.' 1 Restatement (Third), [Property, Servitudes] § 1.2 (1), p. 12 [2000]. Furthermore, '[t]he benefit of an easement or profit is considered a nonpossessory interest in land because it generally authorizes limited uses of the burdened property for a particular purpose.' Id., § 1.2, comment (d), pp. 14–15; see also *Russakoff* v. *Scruggs*, 241 Va. 135, 138, 400 S.E.2d 529 (1991) (easements are not ownership interests but rather privileges to use land of another in certain manner for certain purpose)." *Il Giardino, LLC* v. *Belle Haven Land Co.*, 254 Conn. 502, 528, 757 A.2d 1103 (2000). A valid dedication of an easement to a municipality requires the presence of two elements, a manifested intent by the owner to dedi-

cate the land for the use of the public and *an acceptance by proper authorities or by the general public.* See *Meder* v. *Milford*, 190 Conn. 72, 74, 458 A.2d 1158 (1983).

In the present case, the trial court found insufficient evidence to conclude that Ridge Development or the borough had accepted the easement granted to them by Celentano, and the plaintiffs do not argue that this factual determination was clearly erroneous. Moreover, even if Ridge Development and the borough had accepted the easement, that fact would serve only to subject them to liability, not necessarily to relieve the plaintiffs from liability. See General Statutes § 22a-402 (assigning responsibility to any person owning *or* having care and control).

We disagree with the plaintiffs' argument that they are not liable under § 22a-402 because the borough and Ridge Development subsequently have performed maintenance on the dam. Specifically, they contend that Ridge Development and the borough have installed a concrete beehive over the outlet structure of the detention basin and have erected a gated fence around the basin, thus demonstrating the plaintiffs' lack of control over that area. The efforts of Ridge Development and the borough to mitigate the danger posed by the dam, however, did not operate to relieve the plaintiffs of whatever responsibility they otherwise have under § 22a-402, absent a determination that full control has been transferred to and accepted by the borough and Ridge Development.

The plaintiffs also argue that, because the department had known of the easement and, incorrectly, had treated Ridge Development as the owner of the dam, the plaintiffs no longer have ownership of or control over the dam. We disagree. Notwithstanding the fact that the 1987 order treated Ridge Development as the owner, the plaintiffs knew otherwise because one plaintiff, Cel-

entano, just had conveyed the property to another plaintiff, Cel-Mor. Moreover, General Statutes § 22a-406 provides in relevant part that "[n]othing in this chapter, and no *order*, approval or advice of the commissioner, shall relieve any owner or operator of such a structure from his legal duties, obligations and liabilities resulting from such ownership or operation. . . ." (Emphasis added.) Accordingly, we are concerned not with the content of, or the parties to, the commissioner's prior orders, but rather with whether § 22a-402 may properly apply to the plaintiff under the present one. We conclude, in part III of this opinion, that it may.

We similarly are not persuaded by the plaintiffs' argument that the commissioner has targeted the plaintiffs in a "transparent attempt by the [department] to shift the exorbitant cost of maintaining the detention basin" from Ridge Development and the borough to the plaintiffs. The plaintiffs offer no evidence in support of their conclusory assertion that they, "compared with others similarly situated, [were] selectively treated" and that "such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." (Internal quotation marks omitted.) *Cadlerock Properties Joint Venture, L.P.* v. *Commissioner of Environmental Protection*, supra, 253 Conn. 671 (citing test for equal protection challenge).

### III

We now turn to the plaintiffs' final claim, namely, that the trial court improperly rejected their claim that the commissioner had misapplied the responsible corporate officer doctrine to hold Celentano personally liable.[10] We reject this claim of the plaintiffs.

---

[10] The record reveals that the commissioner grounded Celentano's personal liability on two separate and distinct grounds: (1) the conclusion that Celentano "is a person who has control of the dam" within the meaning of § 22a-402; and (2) the application of the responsible corporate officer doc-

As a threshold matter, we note that whether the responsible corporate officer doctrine may be applied to hold an individual corporate officer liable pursuant to § 22a-402 has not been considered previously by this court. Accordingly, our review is plenary. Id., 669.

In *BEC Corp.* v. *Dept. of Environmental Protection,* supra, 256 Conn. 617–19, borrowing in large part the reasoning of the Minnesota Court of Appeals in *Matter of Dougherty,* 482 N.W.2d 485 (Minn. App. 1992), we adopted the responsible corporate officer doctrine to impose liability under General Statutes § 22a-432, which is part of the Water Pollution Control Act, General Statutes § 22a-416 et seq., upon individual corporate officers.[11] In determining the doctrine's applicability to claims brought under that act, we first examined whether the relevant statutes evidenced the legislature's "[intent] that corporate officers may be held liable under [that statute] under appropriate circumstances." *BEC Corp.* v. *Dept. of Environmental Protection,* supra, 617. Concluding that it did, we crafted and employed a three-pronged test to determine whether such circumstances arose under the facts of that case. Id., 618. Specifically, we held that "a corporate officer is personally liable for the abatement of a violation of § 22a-432 when: (1) the officer is in a position of responsibility that allows that officer to influence corporate policies

---

trine. The trial court, however, mistakenly believed that the commissioner had relied exclusively upon the responsible corporate officer doctrine. Because, however, the commissioner has accepted that interpretation in his argument in this court, we consider only that theory of personal liability.

[11] The responsible corporate officer doctrine is a common-law theory of liability that is similar to, but separate and distinct from, piercing the corporate veil or personal liability for direct participation in tortious conduct. See *Ventres* v. *Goodspeed Airport, LLC,* 275 Conn. 105, 145, 881 A.2d 937 (2005), cert. denied, 547 U.S. 1111, 126 S. Ct. 1913, 164 L. Ed. 2d 664 (2006); *BEC Corp.* v. *Dept. of Environmental Protection,* supra, 256 Conn. 618–19; see also N. Wise, "Personal Liability Promotes Responsible Conduct," 21 Stan. Envtl. L.J. 283, 297–316 (2002) (documenting history and application of doctrine).

and activities; (2) there is a nexus between the officer's actions or inactions in that position and the violation of § 22a-432 such that the corporate officer influenced the corporate actions that constituted the violation; and (3) the corporate officer's actions or inactions resulted in the violation." Id.

In the present case, the commissioner applied the responsible corporate officer doctrine to hold Celentano personally liable under § 22a-402, which empowers the commissioner to order "the person owning or having control" of an unsafe dam "to place it in a safe condition or to remove it . . . ." To determine the appropriateness of employing the responsible corporate officer doctrine under § 22a-402, we follow the analytical course we charted in *BEC Corp.* Thus, as a threshold matter, we must determine whether the legislature intended that, under appropriate circumstances, corporate officers may be held liable under § 22a-402. If so, then we must apply the three-pronged test we crafted in *BEC Corp.* to determine whether, under the facts of the present case, the commissioner properly had held Celentano individually responsible for the repair of the dam.

A

In determining the threshold issue of whether the responsible corporate officer doctrine is applicable within the context of § 22a-402, we begin with the language of the statute. See *BEC Corp.* v. *Dept. of Environmental Protection*, supra, 256 Conn. 617, 621–22; see also *Ventres* v. *Goodspeed Airport, LLC*, 275 Conn. 105, 144–45, 881 A.2d 937 (2005), cert. denied, 547 U.S. 1111, 126 S. Ct. 1913, 164 L. Ed. 2d 664 (2006). Section 22a-402 provides in relevant part: "The [c]ommissioner. . . shall investigate and inspect or cause to be investigated and inspected all dams or other structures which, in his judgment, would, by breaking away, cause loss of

life or property damage. . . . If, after any inspection described herein, the commissioner finds any such structure to be in an unsafe condition, he shall order the person owning or having control thereof to place it in a safe condition or to remove it and shall fix the time within which such order shall be carried out. . . . As used in this chapter, 'person' shall have the same meaning as defined in subsection (c) of section 22a-2. . . ." General Statutes § 22a-2 (c) provides in relevant part: " '[P]erson' means any individual, firm, partnership, association, syndicate, company, trust, corporation, limited liability company, municipality, agency or political or administrative subdivision of the state, or other legal entity of any kind."

The responsible corporate officer doctrine is a common-law theory of liability. See, e.g., *United States* v. *Park*, 421 U.S. 658, 670–73, 95 S. Ct. 1903, 44 L. Ed. 2d 489 (1975). "[B]efore 1985, all of the cases that found an officer or agent personally liable (based upon that individual's position of responsibility within the corporation) did so via a common law interpretation, as the plain language of the [relevant statutes] did not mandate such a result." N. Wise, "Personal Liability Promotes Responsible Conduct," 21 Stan. Envtl. L.J. 283, 309 (2002). Thus, we do not need to determine whether the legislature explicitly has adopted the responsible corporate doctrine in § 22a-402, but rather whether § 22a-402 is the type of statute to which the doctrine generally may apply. See *BEC Corp.* v. *Dept. of Environmental Protection*, supra, 256 Conn. 617 (acknowledging relative ease of application when relevant statute expressly applies to " 'any officer . . . of any . . . corporation' ").

Section 22a-402 applies to "any individual . . . or other legal entity of any kind"; General Statutes § 22a-2 (c); which is a "singularly encompassing definition." *Matter of Dougherty*, supra, 482 N.W.2d 491. In addition,

environmental statutes, such as § 22a-402, are remedial in nature and liberally construed. *MacDermid, Inc.* v. *Dept. of Environmental Protection*, supra, 257 Conn. 154. Section 22a-402 empowers the commissioner to direct its order to "the person *owning or having control*" of the dam; (emphasis added); which evidences the legislature's intent to cast a wide net, as well as its understanding that a person other than the legal owner of the dam may have control thereof. See *Commissioner, Indiana Dept. of Environmental Management* v. *RLG, Inc.*, 755 N.E.2d 556, 561 (Ind. 2001) (defining " 'person' " without specifying "responsible corporate officer"); *Matter of Dougherty*, supra, 491 (same).[12]

Moreover, we have concluded that the responsible corporate officer doctrine applies to "strict liability public welfare offenses." *Ventres* v. *Goodspeed Airport, LLC*, supra, 275 Conn. 144; *BEC Corp.* v. *Dept. of Environmental Protection*, supra, 256 Conn. 618, citing *Matter of Dougherty*, supra, 482 N.W.2d 489.[13] Public welfare

---

[12] The plaintiffs argue that, because the term "person" in § 22a-402 is not defined explicitly to include corporate officer, as it is in § 22a-432; see *BEC Corp.* v. *Dept. of Environmental Protection*, supra, 256 Conn. 617 (citing definition of person under § 22a-423); the legislature could not have intended for the responsible corporate officer to apply to § 22a-402. We disagree. The decision of the legislature expressly to adopt a common-law doctrine in § 22a-432 does not in and of itself abrogate that doctrine as it might apply to another statute in a different chapter of the General Statutes addressing a different, albeit related, subject matter. See *United States* v. *Bestfoods*, 524 U.S. 51, 63, 118 S. Ct. 1876, 141 L. Ed. 2d 43 (1998) ("[i]n order to abrogate a common-law principle, the statute must speak directly to the question addressed by the common law" [internal quotation marks omitted]). The absence of express legislative adoption of the doctrine in § 22a-402 simply necessitates the comprehensive analysis of that statute's language and purpose that we have undertaken in this opinion.

[13] The plaintiffs urge us to reject our characterization of the responsible corporate officer doctrine in *Ventres* v. *Goodspeed Airport, LLC*, supra, 275 Conn. 144, as vague and overly broad. We decline to do so. Although dicta, our description of the responsible corporate officer doctrine in that case mirrored that of the Minnesota Appellate Court in *Matter of Dougherty*, supra, 482 N.W.2d 490, the case upon which we principally relied in adopting the responsible corporate officer doctrine. *BEC Corp.* v. *Dept. of Environmental Protection*, supra, 256 Conn. 618. Moreover, our description in *Ven-*

statutes share three common elements. First, they protect the public health, safety or welfare. *Matter of Dougherty*, supra, 489, citing *United States* v. *Park*, supra, 421 U.S. 672–73; *Morissette* v. *United States*, 342 U.S. 246, 259–60, 72 S. Ct. 240, 96 L. Ed. 288 (1952); *United States* v. *Dotterweich*, 320 U.S. 277, 284–85, 64 S. Ct. 134, 88 L. Ed. 48 (1943). Second, they protect the public from harms from which the public cannot protect themselves. See, e.g., *United States* v. *Dotterweich*, supra, 280; *United States* v. *Hodges X-Ray, Inc.*, 759 F.2d 557, 560–61 (6th Cir. 1985). Third, public welfare statutes have either a reduced mens rea requirement or require none at all. See, e.g., *United States* v. *Park*, supra, 672; *Morissette* v. *United States*, supra, 256.

Section 22a-402 regulates activities and conditions involving dams, which are ranked by hazard classifications, in order to prevent harm to the safety and welfare of citizens that might result from a dam's failure. The legislature also has authorized the commissioner to enter private property to investigate and gather data concerning dams, "as may be necessary *in the public interest* for a proper inspection" of such structures and their environmental impact. (Emphasis added.) General Statutes § 22a-401. When "an emergency exists which presents *a clear and present danger to the public safety*," the commissioner is authorized to take corrective action. (Emphasis added.) General Statutes § 22a-402. Section 22a-402 then places the burden of responding to potential hazards upon those who own or control dams because there are no reasonable measures

---

*tres* captured the essence of the doctrine as it has been applied in the federal courts as well as the courts of our sister states. See *United States* v. *Park*, supra, 421 U.S. 670; *Morissette* v. *United States*, 342 U.S. 246, 259–60, 72 S. Ct. 240, 96 L. Ed. 288 (1952); *United States* v. *Hodges X-Ray, Inc.*, 759 F.2d 557, 560–61 (6th Cir. 1985); *Matter of Dougherty*, supra, 490; *Commissioner, Indiana Dept. of Environmental Management* v. *RLG, Inc.*, supra, 755 N.E.2d 561; *Dept. of Ecology* v. *Lundgren*, 94 Wash. App. 236, 246, 971 P.2d 948 (1999); *State* v. *Rollfink*, 162 Wis. 2d 121, 140, 475 N.W.2d 575 (1991).

that downstream residents could take to do so. Finally, § 22a-402 imposes strict liability upon that owner or person in control without regard to his or her mental state.

It is clear that § 22a-402 is a strict liability public welfare statute sharing all three of the specified common elements. We therefore conclude that the responsible corporate officer doctrine may be employed to hold corporate officers liable under that statute.

## B

Having concluded that individual liability for violations of § 22a-402 may attach pursuant to the responsible corporate officer doctrine, we now examine whether the commissioner appropriately applied that doctrine to hold Celentano personally responsible for the repair of the dam under the facts and circumstances of this case.

The following facts, as set forth by the trial court in its memorandum of decision, are undisputed. "Cel-Mor is the owner of the property where the dam is located. Celentano is the president, sole officer, and sole director and shareholder of Cel-Mor. . . . Celentano is the primary decision maker for Cel-Mor, including final decisions on environmental matters concerning the dam. Cel-Mor uses Celentano's Florida residence as its business address. . . . In the past, Cel-Mor also used Seabonay Beach Resort in Florida, owned by Celentano and his wife, as its business address. . . . Celentano did not know if Cel-Mor paid him rent. . . .

"Celentano was involved in the construction of the dam prior to his conveyance to Cel-Mor of the property on which it is located. . . . [I]n April, 1987, two months after the 1987 order was issued, Celentano transferred the property on which the dam is located to Cel-Mor,

by warranty deed. Also . . . Celentano did not inform [the commissioner] of the transfer. . . .

"On March 30, 1990, Cel-Mor was dissolved by forfeiture. From 1990 to 2001, when he decided to reinstate Cel-Mor, Celentano did business as Cel-Mor. . . . During the period of dissolution, Celentano, [doing business as] Cel-Mor, paid the real estate taxes on the property where the dam is located. . . . He does not recall whether those taxes were paid from a business account or from his personal account. . . .

"Celentano did not recall when he learned that Cel-Mor's corporate status had lapsed. . . . He also could not recall whether he received compensation from Cel-Mor or if Cel-Mor maintained a bank account during the period of dissolution, from 1990 to 2001." (Citations omitted.)

As we noted previously, in *BEC Corp.* v. *Dept. of Environmental Protection,* supra, 256 Conn. 618, we crafted the following three factor test to determine whether a corporate officer can be held personally liable for the abatement of a violation of an applicable statute: "(1) the officer is in a position of responsibility that allows that officer to influence corporate policies and activities; (2) there is a nexus between the officer's actions or inactions in that position and the violation of [the statute] such that the corporate officer influenced the corporate actions that constituted the violation; and (3) the corporate officer's actions or inactions resulted in the violation."

In the present case, Celentano's personal involvement in the development of the Ridge subdivision, his negotiations regarding the repair of the dam and his control over the operation of Cel-Mor demonstrate that he is and has been in the position of responsibility and authority that we contemplated when we adopted the responsible corporate officer doctrine. His actions and,

more importantly, his omissions directly are connected to Cel-Mor's failure to remedy adequately the dam's deficiencies and to place it in a safe condition. As the person in charge of Cel-Mor's operation, and given his intimate involvement in constructing the dam and negotiating with the commissioner regarding the 1983 and 1987 orders, we conclude that Celentano had an affirmative duty to seek out and to remedy violations of § 22a-402. See *United States* v. *Park*, supra, 421 U.S. 672. His failure to do so resulted in Cel-Mor's ownership and control of an unsafe dam in violation of § 22a-402. Accordingly, the 2002 order properly held Celentano personally responsible for the dam's repair.

The plaintiffs argue that there is no factual or causal link to establish that Celentano's conduct led to the violation of § 22a-402 because Celentano had complied with all of the commissioner's prior orders. Specifically, the plaintiffs contend that a decision in favor of the commissioner in this case would permit the commissioner, in the future, to extend personal liability through the responsible corporate officer doctrine without having to establish any act or omission that caused some harm. We disagree. Section 22a-402 is a strict liability statute that empowers the commissioner to "require any person owning or having the care and control" of an unsafe dam to place the dam in a safe condition. Thus, liability under § 22a-402 is grounded upon the status of the dam as unsafe, regardless of how it became unsafe. In other words, the "conduct" underlying a violation of § 22a-402 is the ownership or control of an unsafe dam. The plaintiffs dispute neither that the dam is unsafe nor that Cel-Mor is the owner of that dam.

Accordingly, we also disagree with the plaintiffs' argument that there is no nexus between the actions or omissions of Celentano and the alleged violation of § 22a-402. In the present case, Cel-Mor violated § 22a-402 by virtue of the fact that it owns an unsafe dam.

There is a nexus between that violation and Celentano's actions or omissions insofar as Celentano, despite his personal knowledge of the dam and its condition, has failed to influence Cel-Mor's corporate policy, as the person in charge of its operations, to maintain the dam in a safe condition.[14]

Finally, we are unpersuaded by the plaintiffs' public policy argument that the application of the responsible corporate officer doctrine in this case will "have a negative effect on individuals, companies and business entities seeking to develop property in Connecticut" because a corporate officer "could face personal liability at any time, despite the fact that said person may not have committed any act or omission which has resulted in the direct violation of an environmental statute." This argument ignores the fact that the responsible corporate officer doctrine is available to impose liability upon corporate officers for strict liability public welfare violations only when: "(1) the officer is in a position of responsibility that allows that officer to influence corporate policies and activities; (2) there is a nexus between the officer's actions or inactions in that position and the violation of [the statute] such that the corporate officer influenced the corporate actions that constituted the violation; and (3) the corporate officer's actions or inactions resulted in the violation." *BEC Corp.* v. *Dept. of Environmental Protection*, supra, 256

---

[14] Because we have held that Celentano properly was held personally liable pursuant to the responsible corporate officer doctrine, we also reject the plaintiffs' argument that he should be immune from personal liability pursuant to the doctrine of corporation by estoppel; see *Clark-Franklin-Kingston Press, Inc.* v. *Romano*, 12 Conn. App. 121, 127–28, 529 A.2d 240, cert. denied, 205 Conn. 803, 531 A.2d 935 (1987); for acts done in his capacity as a corporate officer of Cel-Mor during Cel-Mor's period of dissolution from March 30, 1990, until June 13, 2001, during which time he conducted business as Vincent D. Celentano doing business as Cel-Mor Investments, Inc. The responsible corporate officer doctrine operates without regard to whether the corporation is a de facto corporation or de jure corporation.

Conn. 618. Accordingly, we believe that any burden the doctrine imposes upon real estate developers is sufficiently outweighed by the benefit of safe dams that it confers upon the public.

The judgment is affirmed.

In this opinion the other justices concurred.