BRUCE ZIRINSKY *v.* CARNEGIE HILL CAPITAL
ASSET MANAGEMENT, LLC, ET AL.
(AC 33412)

Gruendel, Bear and Espinosa, Js.

Argued September 18—officially released December 25, 2012

*Robert M. Shields, Jr.*, with whom was *Wesley W. Horton*, for the appellants (defendants).

*William I. Haslun II*, with whom, on the brief, was *Carol J. Faherty*, for the appellee (plaintiff).

### Opinion

GRUENDEL, J. The defendants, Carnegie Hill Capital Asset Management, LLC (Carnegie), Michael Jamison and Janice Jamison, appeal from the judgment of the trial court in this easement dispute between neighbors. They claim that the court improperly concluded that (1) the easement in question precluded the plaintiff, Bruce Zirinisky, from planting only those trees in the easement area that blocked their access to an abutting park and playground area and (2) the play system erected in the easement area by the defendants is a permanent structure prohibited under the terms of the easement. We affirm in part and reverse in part the judgment of the trial court.

The relevant facts are undisputed. The plaintiff owns real property known as 17 Brookside Park in Greenwich (servient estate). Carnegie owns real property known as 116 Brookside Drive in Greenwich (dominant estate), which abuts the plaintiff's property.[1] On May 31, 1995, the plaintiff's predecessors in title, David Peeler and Deborah Peeler, executed a written agreement granting an easement over the servient estate to the defendants' predecessors in title, Fred J. Epstein and Kathy Candel Epstein (easement). That written agreement was filed on the Greenwich land records on June 12, 1995. The

---

[1] Michael Jamison is the sole member of Carnegie. He and his wife, the defendant Janice Jamison, maintain a place of abode at 116 Brookside Drive. For convenience only, we refer to them collectively as owners of the dominant estate.

easement described therein consists of an area of 5346 feet located on the easterly portion of the servient estate adjacent to the defendants' property. The easement provides in relevant part that "[w]hereas Peeler has agreed, for the consideration of one ($1.00) dollar to grant Epstein, his heirs, successors and assigns an exclusive and perpetual [t]enement to use a portion of Peeler's property. Now therefore . . . Peeler hereby grants to Epstein the following easement:

"1. Epstein shall have an exclusive and perpetual easement to use that portion of Peeler's property which is shown on the Map entitled 'Map Showing Easement Area To Be Granted To Frederick J. & Kathy C. Epstein Across the Property Of David & Deborah Peeler Greenwich, Conn.', said Map being filed in the Office of the Town Clerk of Greenwich simultaneously with this Agreement, said area being bounded as described in Schedule A attached hereto, hereinafter the 'Easement Property.'

"2. Said Easement Property may be used by Epstein for any lawful purpose, including, but not limited to landscaping and maintaining the grounds and Epstein agrees to maintain the Easement Property in a neat and landscaped condition. Epstein agrees that no construction of any permanent structure may be erected on the Easement Property.

"3. Epstein shall maintain liability insurance for the use of the Easement Property and shall hold Peeler harmless from any and all losses, claims or suits involving the Easement Property, unless due to the negligence or intentional acts of Peeler.

"4. The terms of this Agreement shall run with the land and shall be binding upon the parties hereto, their heirs, successors and assigns and is intended to benefit and be appurtenant to the property owned by Epstein and referenced above."

In its memorandum of decision, the court found that "[t]he map referred to in the first paragraph of the easement agreement was recorded in the Greenwich land records on June 12, 1995, as map no. 7036. . . . The map shows the boundaries of both the [dominant and servient estates], the location of the easement within the [servient estate] as well as the location of the residences and outbuildings on both properties. The map also shows an area marked 'Reserved For Park and Playground,' located to the south of the [dominant estate] and to the east of the [servient estate]. The owners of both properties apparently have the right to use the 'Park and Playground' area." (Citation omitted.)

The plaintiff acquired title to the servient estate on June 24, 2003; the defendants acquired title to the dominant estate on December 5, 2003. The parties purchased their respective properties subject to the provisions of the easement. Approximately one year later, the present dispute arose when the defendants erected a large play system over part of the easement area. As the court recounted: "In the fall of 2004, Michael Jamison asked the plaintiff's permission for a delivery vehicle to use the plaintiff's driveway to make a delivery to [his] residence. The plaintiff granted permission without inquiring as to the nature of the proposed delivery. Thereafter, a truck arrived and workmen proceeded to erect a 'Monster Double Whammy' play system partially on the [defendants'] property and partially on the easement area. The play system, which the [defendants] purchased from Rainbow Play Systems, Inc., consisted of swings, slides, ladders and towers. According to the manufacturer's catalogue . . . the base unit of the play system weighs 1759 pounds. The catalogue describes the base unit as follows: 'The Monster Castle is built like a tank.' . . . Photographs of the system installed by the [defendants] . . . show that their installation is at least twice the size of the base unit shown in the

catalogue. Page 193 of the same catalogue states that many of the components of the play system were included in a 'lifetime warranty' and that the remaining components were guaranteed for five years. . . .

"The installation of the play system surprised and disturbed the plaintiff. However, he made little or no effort to contact the [defendants] until March 17, 2005, when he directed his attorney to write a letter to the [defendants] asserting that the play system was placed within the easement area in violation of the prohibition against permanent structures. . . . Within two months of that letter, the [defendants] left one or two notes at the plaintiff's home offering to discuss the plaintiff's concerns regarding the play system and leaving a contact number. . . . After four months, the plaintiff telephoned the [defendants]. However, because he called on a solemn religious holiday observed by the [defendants], no meaningful conversation took place at that time. Neither side made any further efforts to engage in a dialogue concerning the play system.

"In early 2006, the [defendants] undertook a major renovation/reconstruction of the residence on [their] property. Because of the construction work, maintenance of the easement property was neglected for several months. In late 2006, the plaintiff decided to install additional trees on his property to screen the play system and the [defendants'] backyard from his view. He did not have the boundaries of the easement area staked by a surveyor. Rather, he claimed that he worked with employees of a tree nursery in a good faith attempt to plant the trees along the boundary of the easement area. The plaintiff spent approximately $88,000 for the acquisition and installation of the new trees. He estimated that about 20 percent of this cost was incurred in order to screen the play system from his sight. After the trees were planted, the defendants retained a surveyor who determined that approximately six of the

new trees (spruces with trunk diameters of six to eight inches) were planted within the easement area.[2] . . .

"In April, 2007, the plaintiff brought this action against the defendants claiming that the erection of the play system within the easement violated the prohibition against permanent structures. In the first count of his complaint, the plaintiff requests an injunction ordering the removal of the play system from the easement area. In the second, third and fourth counts, the plaintiff claims damages for trespass, damages for misuse of the easement and damages for overburdening the easement. . . . The defendants' answer admitted the essential factual allegations of the plaintiff's complaint but denied the legal conclusions with respect to violation of the easement and trespass. [The defendants] also filed a counterclaim alleging . . . that the planting of spruce trees within the easement area constituted a trespass on [their] exclusive right to maintain landscaping within the easement area and . . . that the planting of the spruce trees interferes with [their] use of the easement . . . and . . . requesting injunctive relief."

A court trial followed on January 25, 2011, at which time the parties stipulated that the play system was a structure but disagreed as to whether it was a permanent one. After hearing evidence from the parties and at their request, the court on March 29, 2011, visited the plaintiff's property and viewed both the defendants' play system and the trees planted by the plaintiff in the easement area. In its subsequent memorandum of decision, the court concluded that, on the facts of this case, "the play system is, in fact, a permanent structure erected in violation of the terms of the easement." It therefore granted an injunction "requiring the defendants to remove the play system from the easement area

---

[2] Multiple photographs of the trees were admitted into evidence, including ones depicting their installation.

within a reasonable time." The court further determined that three of the six trees planted by the plaintiff in the easement area "created an effective barrier to the defendants' access over the easement to reach the reserved park and playground area lying to the south of [their] property," which constituted an unreasonable use of the easement. Accordingly, the court concluded that the defendants were entitled to injunctive relief on their counterclaim requiring the plaintiff to remove those three trees from the easement area. From that judgment, the defendants appeal.

Before considering the defendants' specific claims, we note that "[a]n easement creates a nonpossessory right to enter and use land in the possession of another and obligates the possessor not to interfere with the uses authorized by the easement." (Internal quotation marks omitted.) *Celentano* v. *Rocque*, 282 Conn. 645, 660, 923 A.2d 709 (2007). "Except as limited by the terms of the servitude . . . the holder of an easement . . . is entitled to use the servient estate in a manner that is reasonably necessary for the convenient enjoyment of the servitude." 1 Restatement (Third), Property, Servitudes § 4.10, p. 592 (2000). Likewise, "[e]xcept as limited by the terms of the servitude . . . the holder of the servient estate is entitled to make any use of the servient estate that does not unreasonably interfere with enjoyment of the servitude." Id., § 4.9, p. 581; see also *American Brass Co.* v. *Serra*, 104 Conn. 139, 150, 132 A. 565 (1926) ("[t]he owners of the servient tract have by law all the rights and benefits of ownership consistent with the existence of the easement, and the exercise of such rights is not an adverse or hostile act which gives the owner of the dominant tract a right of action therefor").

"Easements are classified as either easements appurtenant or easements in gross. . . . Two distinct estates are involved in an easement appurtenant: the dominant

to which the easement belongs and the servient upon which the obligation rests. . . . An easement appurtenant must be of benefit to the dominant estate but the servient estate need not be adjacent to the dominant estate. . . . An easement in gross is one which does not benefit the possessor of any tract of land in his use of it as such possessor. . . . An easement in gross belongs to the owner of it independently of his ownership or possession of any specific land. Therefore, in contrast to an easement appurtenant, its ownership may be described as being personal to the owner of it." (Citations omitted; internal quotation marks omitted.) *Il Giardino, LLC* v. *Belle Haven Land Co.*, 254 Conn. 502, 512, 757 A.2d 1103 (2000). "An easement appurtenant lives with the land. It is a parasite which cannot exist without a particular parcel of realty. An appurtenant easement is incapable of existence separate and apart from the particular land to which it is annexed. . . . [B]ecause of the incorporeal nature of an easement appurtenant, its owner cannot be disseized or otherwise ousted of it; he can only be disturbed or obstructed in its enjoyment." (Internal quotation marks omitted.) *Hyde Road Development, LLC* v. *Pumpkin Associates, LLC*, 130 Conn. App. 120, 125, 21 A.3d 945 (2011). It is undisputed that the present case involves an easement appurtenant, as expressly indicated in the deeded easement itself.

I

The defendants first contend that the planting of six large trees inside the easement area violates the terms of the easement. As a result, they claim that the court incorrectly determined that the plaintiff must remove only those three trees that blocked their access to the abutting park and playground area. We agree.

This court recently observed that "review of the court's conclusion that [certain] plantings violated . . .

easement rights involves a mixed question of fact and law. [S]o-called mixed questions of fact and law, which require the application of a legal standard to the historical-fact determinations, are not facts in this sense. . . . [Such questions require] plenary review by this court unfettered by the clearly erroneous standard. . . . When legal conclusions of the trial court are challenged on appeal, we must decide whether [those] . . . conclusions are legally and logically correct and find support in the facts that appear in the record." (Internal quotation marks omitted.) *D'Appollonio* v. *Griffo-Brandao*, 138 Conn. App. 304, 323–24, 53 A.3d 1013 (2012).

It is well established that "[i]n construing a deed, a court must consider the language and terms of the instrument as a whole. . . . Our basic rule of construction is that recognition will be given to the expressed intention of the parties to a deed or other conveyance, and that it shall, if possible, be so construed as to effectuate the intent of the parties. . . . In arriving at the intent expressed . . . in the language used, however, it is always admissible to consider the situation of the parties and the circumstances connected with the transaction, and every part of the writing should be considered with the help of that evidence. . . . The construction of a deed in order to ascertain the intent expressed in the deed presents a question of law and requires consideration of all its relevant provisions in the light of the surrounding circumstances. . . . Thus, if the meaning of the language contained in a deed or conveyance is not clear, the trial court is bound to consider any relevant extrinsic evidence presented by the parties for the purpose of clarifying the ambiguity. . . . Finally, our review of the trial court's construction of the instrument is plenary."[3] (Citations omitted; internal quotation marks omitted.) *Il Giardino, LLC* v. *Belle Haven Land Co.*, supra, 254 Conn. 510–11.

---

[3] In its memorandum of decision, the court found that "[n]either party presented any evidence as to the intent of the parties to the 1995 deed creating the easement."

Relevant to our inquiry is paragraph two of the easement, which provides: "Said Easement Property may be used by Epstein for any lawful purpose, including, but not limited to landscaping and maintaining the grounds and Epstein agrees to maintain the Easement Property in a neat and landscaped condition. Epstein agrees that no construction of any permanent structure may be erected on the Easement Property." By its plain language, the grant contained therein is vast. It grants the dominant estate holder the right to use the easement area "for any lawful purpose . . . ." It contains no restriction on that grant, save for the prohibition of permanent structures.

An easement is an instrument that "carves out specific uses for the servitude beneficiary." 1 Restatement (Third), supra, § 4.19, comment (c), p. 582. In the normal case, the easement specifically delineates the limited bounds of permitted use. See, e.g., *Celentano* v. *Rocque*, supra, 282 Conn. 659 n.9 (granting "a drainage easement and right to grade and construct a water retention basin over and upon . . . [a] portion of [the] property . . . for the purpose of constructing, grading and maintaining a detention basin thereon and for all other purposes connected therewith to detain the flow of storm waters"); *Dean* v. *Zoning Commission*, 96 Conn. App. 561, 567 n.8, 901 A.2d 681 (granting "the right, privilege, and authority to perpetually maintain a parking lot for up to ten [10] parking spaces for the use of the premises abutting the premises below described to the north, only if required so that the premises to the north will comply with the off-street parking regulations of, the City of Norwalk, over the following described property: 'Parking spaces No. 9 through 18 inclusive on assessor's lots 20 & 21 on that certain [map] . . . which map is to be filed simultaneously with the recording of this easement' "), cert. denied, 280 Conn. 937, 910 A.2d 217 (2006). For that reason, our Supreme Court has

explained that an easement "*generally* authorizes limited uses of the burdened property for a particular purpose." (Emphasis added; internal quotation marks omitted.) *Il Giardino, LLC* v. *Belle Haven Land Co.*, supra, 254 Conn. 528, citing 1 Restatement (Third), supra, § 1.2, comment (d), pp. 14–15. That general rule is inapposite in this case, as the easement does not set forth specific, limited uses. Rather, it provides that the servitude beneficiary is entitled to use the easement area "for any lawful purpose" so long as it does not involve the erection of a permanent structure.

In their posttrial brief, the defendants argued that the six large spruce trees planted by the plaintiff in the easement area occupied "a considerable amount of the easement space both laterally and vertically," which interfered with the defendants' use thereof. In their appellate brief, the defendants argue that, given the considerable grant in favor of the dominant estate, the trees interfere with numerous lawful activities within the easement area, such as "sunbathing or . . . playing volleyball or . . . placing picnic tables or . . . growing vegetables or flowers needing sun exposure . . . ." We agree. Indeed, Janice Jamison testified at trial that the trees interfere with the ability of her children to run freely around the easement area.

In its memorandum of decision, the court concluded that three of the spruce trees "created an effective barrier to the defendants' access over the easement to reach the reserved park and playground area lying to the south of [their] property." Accordingly, it granted injunctive relief requiring the plaintiff to remove those trees.[4] At the same time, the court also found that the "evidence does not show that the [remaining three] trees planted by the plaintiff unreasonably interfere

---

[4] In his appellate brief, the plaintiff states that he "does not contest this aspect of [the court's] decision and plans on removing the three trees."

with the defendants' use of the easement area." The record belies that determination. The deeded easement specifically authorizes the defendants to engage in "any lawful purpose" of the easement area that did not involve the construction of a permanent structure. The vast grant to engage in "any lawful purpose" encompasses a myriad of activities on the easement area, such as those proffered by the defendants. Moreover, the defendants introduced evidence that the trees planted by the plaintiff interfered with the ability of the Jamisons' children to run around the area freely.

Furthermore, it bears emphasis that the easement granted the defendants the right to engage in "any lawful purpose, *including, but not limited to landscaping and maintaining the grounds* . . . ." (Emphasis added.) The planting of trees is a quintessential example of landscaping. Because an easement obligates the servient estate holder not to interfere with the uses authorized by the easement; *Celentano* v. *Rocque*, supra, 282 Conn. 660; the plaintiff's conduct in planting six large spruce trees in the easement area plainly interfered with the defendants' right to landscape and maintain the area, as specifically provided for in the deeded easement. In light of the foregoing, we conclude that the court improperly determined that only those trees planted in the easement area that blocked access to an abutting park and playground area violate the deeded easement.

II

The defendants also claim that the court improperly concluded that the play system erected in the easement area is a permanent structure prohibited under the terms of the easement. The parties do not dispute that the deeded easement prohibits the construction of any permanent structure on the easement area. Nor do they dispute the fact that the play system is a structure and

that it is massive in size.[5] The sole question before us is whether the court properly found that it is permanent in nature. On the facts of this case, we agree with that determination.

As the court stated in its memorandum of decision, no Connecticut court has construed the phrase "permanent structure" in the present context.[6] Like any construction of a conveyance instrument, proper interpretation of that phrase requires consideration of all provisions of the deeded easement. See *Wykeham Rise, LLC* v. *Federer*, 305 Conn. 448, 457, 52 A3d 702 (2012) (every part of writing should be considered in interpreting deed). As we already noted, the easement here contains a straightforward proscription mandating that the dominant estate holder shall not construct "any permanent structure . . . on the [e]asement [p]roperty."

"To ascertain the commonly approved usage of a word, we look to the dictionary definition of the term." (Internal quotation marks omitted.) *Stone-Krete Construction, Inc.* v. *Eder*, 280 Conn. 672, 678, 911 A.2d 300 (2006); see also *D'Appollonio* v. *Griffo-Brandao*, supra, 138 Conn. App. 324 (dictionary definitions used to interpret terms of easement). "Permanent" is defined in one dictionary as "[t]o continue indefinitely"; Ballentine's Law Dictionary (3d Ed. 1969); and in another as "continuing or enduring (as in the same state, status, place) without fundamental or marked change: not subject to fluctuation or alteration: fixed or intended to be

---

[5] The brochure for the Monster Double Whammy play system, which was admitted into evidence, indicates that it is 48.5 feet long, 22.5 feet wide and 14.5 feet high. The brochure further represents that "the Monster Double Whammy rivals the size and play activities of a $35,000 park and school commercial playground."

[6] Our Supreme Court discussed permanent structures in the context of claims of adverse use in *Smith* v. *Muellner*, 283 Conn. 510, 932 A.2d 382 (2007).

fixed: lasting, stable." Webster's Third New International Dictionary (2002). Similarly, this court in *LePage Homes, Inc.* v. *Planning & Zoning Commission,* 74 Conn. App. 340, 349, 812 A.2d 156 (2002), relied on Black's Law Dictionary (6th Ed. 1990) for its definition of permanent as "[c]ontinuing or enduring in the same state, status, place, or the like, without fundamental or marked change, not subject to fluctuation, or alteration, fixed or intended to be fixed; lasting; abiding; stable; not temporary or transient. . . . Generally opposed in law to temporary, but not always meaning perpetual." (Internal quotation marks omitted.) See also *Johnson* v. *Charles William Palomba Co.,* 114 Conn. 108, 114, 157 A. 902 (1932) (permanent structure is one "not . . . apt to change"); *American Brass Co.* v. *Serra,* supra, 104 Conn. 149 (fence at issue not permanent structure because could be removed with hardly any trouble or expense and is so slight). Furthermore, one sibling jurisdiction has defined the term "permanent structure" as "one which may not be readily remedied, removed, or abated at a reasonable expense, or one of a durable character evidently intended to last indefinitely, costing as much to alter as to build it in the first instance." *Dugan* v. *Long,* 234 Ky. 511, 515, 28 S.W.2d 765 (1930).

In our view, the appropriate analytical approach to the question presented is a fact specific one. The foregoing definitions persuade us that a court, in considering whether a given structure is permanent in nature, should evaluate a variety of factors, including—but not limited to—the structure's size, weight, durability, stability and mobility. Only after weighing such factors may a court render a factual finding as to whether the structure at issue is a permanent one.

The court in the present case found that there was evidence before it "of the durable character of the play system and its indefinite useful life." In particular, the court credited the description of the play system as

"built like a tank" in the manufacturer's catalogue and its "lifetime guarantee," as was the court's exclusive prerogative as arbiter of credibility. The court also emphasized the significant size and weight of the "Monster Double Whammy" play system.[7] The court further noted that, in the years since it was erected in 2004, "the play system has remained firmly in the same place where it was erected and has not been moved or relocated on a seasonal basis."[8] In addition, the court visited the property at the request of the parties and observed the play system firsthand, affording it a perspective no appellate record can replicate.

Those considerations underlie the court's finding that the play system constructed by the defendants constituted a permanent structure in violation of the terms of the easement. On the record before us, we cannot say that the court's finding is clearly erroneous. We therefore conclude that the court properly rendered injunctive relief ordering the defendants to remove the play system from the easement area.

The judgment is reversed in part and the case is remanded to the trial court with direction to enter an order requiring the plaintiff to remove the six spruce trees planted in the easement area. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

---

[7] Although the record does not disclose the total weight of the play system, the base unit itself approaches one ton. The court specifically found that the defendants' play system "is at least twice the size of the base unit . . . ."

In their appellate brief, the defendants argue that the play system "sits on [their] lawn without any mechanism affixing or anchoring it to the ground to give it an element of permanency." That argument overlooks the fact, noted by our Supreme Court in *Historic District Commission* v. *Hall*, 282 Conn. 672, 681, 923 A.2d 726 (2007), that "[t]here . . . can be no doubt that gravity may serve the . . . purpose of 'affixing' a very heavy object to land . . . ."

[8] The defendants in their appellate brief concede "that there is no evidence directly providing the expense or number of hours necessary to disassemble the defendants' play system . . . ."