******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JOHN AVERY ET AL. *v.* LUIS MEDINA ET AL.
(AC 36326)

DiPentima, C. J., and Mullins and Bear, Js.

*Argued May 12—officially released July 8, 2014*

(Appeal from Superior Court, judicial district of
Litchfield, Pickard, J.)

*Shelley E. Harms*, for the appellants (plaintiffs).

*Luis A. Medina*, with whom was *Richard R. Lavieri*,

for the appellees (defendants).

*Opinion*

MULLINS, J. The plaintiffs, John Avery, Elisabeth Avery and Shelley Harms, appeal from the judgment of the trial court in part denying their request for injunctive relief against the defendants, Luis Medina and Amanda Medina.[1] On appeal, the plaintiffs claim that the court (1) erred in concluding that a newly constructed stone wall did not violate a restrictive covenant in the defendants' deed that prohibits the construction of any "permanent structure" within 100 feet of the westerly line of the road, (2) made clearly erroneous factual findings, and (3) improperly declined to award punitive damages. Because we conclude that the stone wall is a permanent structure, we reverse in part the judgment of the trial court.

The trial court found the following relevant facts. "Harms, and her husband, David Torrey, have, since at least 2003, owned and resided in a home at the intersection of Schoolhouse Road and Winchester Road in Norfolk ('Harms property'). Adjoining their property to the south on Winchester Road is property owned by the plaintiffs, John Avery and Elisabeth Avery ('Avery property'). Sometime in late 2002, the plaintiffs became aware that a 55.72 acre parcel of wooded, undeveloped land adjoining the Avery property was on the market for sale. The plaintiffs and . . . Torrey decided that they would like to prevent this property from being heavily developed and to preserve a significant part of it as open space. They agreed that they would attempt to buy the 55.72 acres but that they would need another investor to join them.

"In February, 2003 . . . Torrey approached his law partner, Luis Medina, about investing money in the project and receiving a building lot in return. After looking at the property, the defendants . . . agreed to invest in the project and receive a building lot. Although Ms. Harms, Mr. Torrey, Ms. Medina and Mr. Medina are all attorneys, the parties were surprisingly lax about legal representation for this project. By default, the co-owners left it to . . . Harms to work with the law firm of Ackerly Brown to represent them in the project. There was no evidence that the parties contemplated that they would have conflicting interests during the project, although this is clear in retrospect.

"A satisfactory purchase price was negotiated for purchase of the property, but Ackerly Brown already represented the seller and referred the parties to Attorney William J. Manasse. Attorney Manasse prepared a co-ownership agreement for the parties, although he believed that he was only representing . . . Harms.

"The three couples purchased the 55.72 acres on April 6, 2003, with each couple receiving an undivided one-third interest. It does not appear that the six parties were represented by anyone in that purchase. The seller

was represented by Ackerly Brown and, for reasons that are not clear, Attorney Manasse did not represent the six parties in the purchase. Thereafter, the six co-owners agreed that the forty-seven acres would be conveyed to the Norfolk Land Trust, Inc., subject to a conservation easement granted to the Winchester Land Trust. The three couples signed a co-ownership agreement on April 11, 2003, in which all parties expressed their intent to subdivide the 55.72 acres into three lots: two, four acre building lots and forty-seven+/- acres of undivided land would be sold or donated with the three couples sharing equally in the tax benefits obtained. The parties expressed their intent that John Avery and Elizabeth Avery would receive the four acre lot adjoining the Avery property ('Avery lot') and that Luis Medina and Amanda Medina would receive the other four acre lot ('Medina lot').

"Once the parties had purchased the 55.72 acres and had signed the [co-ownership] agreement . . . Harms consulted with Attorney Michael Sconyers of Ackerly Brown about preparing draft deeds to [the Averys, the defendants] and the two land trusts. Attorney Sconyers believed that . . . Harms was acting as a spokesperson for all the co-owners. As a result of advice from Attorney Sconyers, the draft deeds to the defendants and the Averys contained different language in two respects than is found in the [co-ownership] agreement. The co-ownership agreement stated that the Avery lot and the Medina lot 'will contain deed restrictions providing that the lot shall not be further divided, will contain only one single-family dwelling, and not more than two additional outbuildings with a reasonable setback from the road for any structures and will be subject to a right of first refusal for each of the other co-owners . . . .' The co-ownership [agreement] was silent as to enforcement of these deed restrictions. Attorney Sconyers discussed with . . . Harms that 'a reasonable setback' should be made more specific and that there should be persons named to enforce the restrictions.

"The deed prepared for the defendants' lot changed the language about 'a reasonable setback from the road for any structures' to 'any permanent structure erected on the property shall be located at least 100 feet distant from the westerly line of Winchester Road.' The deed to the defendants also provides that the restrictions in the deed 'shall be enforceable by Grantors, their heirs and assigns in perpetuity, as an appurtenance to the property of the Grantors.' The Grantors are the five parties to this case plus . . . Torrey. Neither Attorney Sconyers nor . . . Harms discussed these changes with the defendants.

"Although the testimony is conflicting, the credible evidence is that the three couples met in February, 2004, to review the draft deeds prepared by Attorney Sconyers. It does not appear that the defendants took

the opportunity to carefully read the draft deed which would convey their lot to them. The result of that meeting was that all parties approved the draft deeds.

"The deeds were signed by the plaintiffs and . . . Torrey on August 8, 2004, and by the defendants on August 10, 2004. The defendants had no legal representation in the purchase of their lot, although they paid $70,000 for it. Despite this fact, the defendants, who are both attorneys, did not read the deeds carefully prior to signing them and taking delivery of the deed to their lot. Thus, they did not see that the 'reasonable setback' had been changed to '100 feet distant from the westerly line of Winchester Road' or that the grantors were designated for enforcement.

"After the parties purchased their land, Winchester Road became the subject of an application to designate it as a scenic road within the town of Norfolk. The application describes that Winchester Road is bordered by stone walls along much of its length.

"Since 2004, the defendants have built a house with attached garage with dimensions of approximately 86.5' x 28,' a carriage house with dimensions of approximately 56' x 24.5,' and a shed on a cement pad with dimensions of approximately 16.3' x 9.7.'

"In November 2011, [Luis] Medina told . . . Torrey that he and his wife were going to construct a 'pole barn' in an area north of the carriage house. . . . Torrey told [Luis] Medina that this would be a third 'outbuilding' and would be in violation of the restrictive covenant in the deed. Despite this warning, the defendants began construction of a wooden pole barn with dimensions of [twenty-eight feet by twenty-five feet]. . . .

"The plaintiffs notified the defendants that they considered the pole barn to be a third 'outbuilding' in violation of the condition in the defendants' deed that there shall be 'no more than two (2) outbuildings.' The defendants, who have not received a building permit for the pole barn and have been issued a cease and desist order by the town of Norfolk, refused to remove it. In this suit, the plaintiffs seek an injunction prohibiting further construction of the pole barn and an order that it be removed.

"After this suit was commenced, the defendants . . . built a new stone wall along portions of the southerly and easterly borders of their land. The portion of the wall along the Winchester Road side of the property is on or within a few feet of the border of the defendants' land and about [twenty] feet from the paved portion of Winchester Road. The wall has an average height of [three] feet with taller pillars on both sides of the driveway. The wall is topped by a decorative white fence of wood or plastic about 1.5 feet in height. . . .

"The plaintiffs have amended their complaint to add allegations that the wall is a new permanent structure

in violation of the restrictive covenant in the defendants' deed which prohibits new permanent structures within 100 feet of the road." (Footnote omitted.) In addition to seeking injunctive relief, the plaintiffs also requested costs and punitive damages.

After a trial to the court, the court found that the defendants' construction of the pole barn violated the restrictive covenant in the defendants' deed that limits development on their property to one single-family dwelling and no more than two additional outbuildings, and it ordered the defendants to remove it. The court also found that the stone wall constructed by the defendants did not violate the restrictive covenant that prohibits permanent structures from being erected within 100 feet of Winchester Road because the wall was not permanent. The court declined to award punitive damages to the plaintiffs because it concluded that the defendants' conduct was not wanton or malicious. This appeal followed.[2]

On appeal, the plaintiffs claim that the court (1) erred in concluding that the stone wall was not a permanent structure, (2) made clearly erroneous findings regarding whether the stone wall contained concrete and whether Harms drafted the defendants' deed, and (3) improperly declined to award punitive damages. We will consider each of these claims in turn.

I

The plaintiffs claim that the court erred in concluding that the defendants' stone wall was not a permanent structure, as that term is used in the restrictive covenant set forth in the defendants' deed. We agree.

"[T]he determination of the intent behind language in a deed, considered in the light of all the surrounding circumstances, presents a question of law on which our scope of review is . . . plenary. . . . Thus, when faced with a question regarding the construction of language in deeds, the reviewing court does not give the customary deference to the trial court's factual inferences. . . .

"The meaning and effect of the [restrictive covenant] are to be determined, not by the actual intent of the parties, but by the intent expressed in the deed, considering all its relevant provisions and reading it in the light of the surrounding circumstances . . . . The primary rule of interpretation of such [restrictive] covenants is to gather the intention of the parties from their words, by reading, not simply a single clause of the agreement but the entire context, and, where the meaning is doubtful, by considering such surrounding circumstances as they are presumed to have considered when their minds met. . . . A restrictive covenant must be narrowly construed and ought not to be extended by implication. . . . Moreover, if the covenant's language is ambiguous, it should be construed

against rather than in favor of the covenant." (Citations omitted; internal quotation marks omitted.) *Alligood* v. *LaSaracina*, 122 Conn. App. 479, 482, 999 A.2d 833 (2010).

The defendants' deed contains the following restrictions: "The property is conveyed subject to the following restrictions, which restrictions shall be enforceable by the Grantors, their heirs, successors and assigns in perpetuity, as an appurtenance to the property of the Grantors:

"1. The Property shall not be further divided, subdivided or resubdivided, as those terms are defined in the Connecticut General Statutes, or in any way diminished in size;

"2. No more than one (1) single family dwelling may be erected on the Property, with no more than two (2) outbuildings.

"3. *Any permanent structure erected on the Property shall be located at least 100 feet distant from the westerly line of Winchester Road.*" (Emphasis added.)

In construing the term "permanent structure" set forth in the third restrictive covenant in the defendants' deed, the court determined that the phrase was ambiguous and should be construed against the drafter, whom the court found to have been Harms.[3] The court further concluded that, although the stone wall "[o]bviously" is a structure, it is not a permanent structure. The plaintiffs argue that the term "permanent structure" is not ambiguous and that the court erred in concluding that the wall was not permanent in nature. We agree.

"[W]hether . . . a term is ambiguous turns on whether it has varying definitions in common parlance. See *Honulik* v. *Greenwich*, [293 Conn. 698, 710, 980 A.2d 880 (2009)] (contractual language must be interpreted according to 'its common, natural, and ordinary meaning and usage' . . .)." *Remillard* v. *Remillard*, 297 Conn. 345, 355–56, 999 A.2d 713 (2010). We conclude that the term "permanent structure" has a common, natural and ordinary meaning, and that it, therefore, is not ambiguous.

"To ascertain the commonly approved usage of a word, we look to the dictionary definition of the term. . . . *Stone-Krete Construction, Inc*. v. *Eder*, 280 Conn. 672, 678, 911 A.2d 300 (2006); see also *D'Appollonio* v. *Griffo-Brandao*, [138 Conn. App. 304, 324, 53 A.3d 1013 (2012)] (dictionary definitions used to interpret terms of easement). Permanent is defined in one dictionary as [t]o continue indefinitely; Ballentine's Law Dictionary (3d Ed. 1969); and in another as continuing or enduring (as in the same state, status, place) without fundamental or marked change: not subject to fluctuation or alteration: fixed or intended to be fixed: lasting, stable. Webster's Third New International Dictionary (2002). Similarly, this court in *LePage Homes, Inc*. v.

*Planning & Zoning Commission*, 74 Conn. App. 340, 349, 812 A.2d 156 (2002), relied on Black's Law Dictionary (6th Ed. 1990), for its definition of permanent as [c]ontinuing or enduring in the same state, status, place, or the like, without fundamental or marked change, not subject to fluctuation, or alteration, fixed or intended to be fixed; lasting; abiding; stable; not temporary or transient. . . . Generally opposed in law to temporary, but not always meaning perpetual. . . . See also *Johnson* v. *Charles William Palomba Co.*, 114 Conn. 108, 114, 157 A. 902 (1932) (permanent structure is one not . . . apt to change); *American Brass Co.* v. *Serra*, [104 Conn. 139, 149, 132 A. 565 (1926)] (fence at issue not permanent structure because could be removed with hardly any trouble or expense and is so slight)." (Internal quotation marks omitted.) *Zirinsky* v. *Carnegie Hill Capital Asset Management, LLC*, 139 Conn. App. 706, 719–20, 58 A.3d 284 (2012). Given the similarity in these definitions, and guided by *Zirinsky*, we conclude that the term "permanent structure" is not ambiguous but equates to a structure that is not meant to be temporary or transient, but, rather, is meant to be fixed, lasting, and not readily abated.

We next consider the court's conclusion that the stone wall in question was not a permanent structure.[4] "[T]he appropriate analytical approach to the question [of whether a structure is permanent] . . . is a fact specific one. . . . [A] court, in considering whether a given structure is permanent in nature, should evaluate a variety of factors, including—but not limited to—the structure's size, weight, durability, stability and mobility." *Zirinsky* v. *Carnegie Hill Capital Asset Management, LLC*, supra, 139 Conn. App. 720.

Here, the trial court, considering the factors set forth in *Zirinsky*, found that "[t]he wall is large in size, is undoubtedly heavy and is immobile. Its stability and durability are less certain as there was no evidence submitted. Despite these factors weighing in favor of the plaintiffs, the surrounding circumstances of the defendant[s'] deed, the addition of the modifying word 'permanent,' and the rules of construction convince the court that the stone wall should not be considered a permanent structure as that word is used in the deed. There is nothing about the surrounding circumstances which would lead to the conclusion that a stone wall at or near the boundary line of the property would be contrary to the intent of the parties."

The court also determined: "Whether the stone wall constructed by the defendants is permanent depends in part upon the plaintiffs' argument that it was constructed with a concrete core. A concrete core would provide an internal permanence and an attachment to the ground, which one would expect with a permanent structure. The evidence does not support the claim of a concrete core." The court concluded: "Coupled with

the surrounding circumstances, which do not weigh in favor of the interpretation that a stone wall would be out of place in front of a residence on Winchester Road in Norfolk, and applying the rules of construction . . . the court is unable to conclude that the defendants' wall is a permanent structure."[5]

The plaintiffs argue that the testimonial and pictorial evidence demonstrated that the stone wall contained concrete and that, even if the court did not credit this uncontested evidence, "there can be no doubt that [the] defendants' stone wall, which the trial court found to be 'undoubtedly heavy' . . . is 'affixed' to the land by gravity." (Citation omitted.) They further argue that employing the factors set forth in *Zirinsky*, "the stone wall cannot be seen as anything but a permanent structure." We agree.

In *Zirinsky*, we were called upon to determine whether an easement that "provide[d] that the servitude beneficiary [was] entitled to use the easement area 'for any lawful purpose' so long as it [did] not involve the erection of a permanent structure"; *Zirinsky* v. *Carnegie Hill Capital Asset Management, LLC*, supra, 139 Conn. App. 717; prohibited the installation of a play system. Id., 718. The easement in *Zirinsky* "contain[ed] a straightforward proscription mandating that the dominant estate holder shall not construct 'any permanent structure . . . on the [e]asement [p]roperty.' " Id., 719. The trial court in *Zirinsky* had determined that the play system was a permanent structure, prohibited by the clear language of the easement. Id., 721. The court noted that the play system was "48.5 feet long, 22.5 feet wide and 14.5 feet high"; id., 719 n.5; and that the base unit of the play system weighed approximately one ton. Id., 721 n.7. It also found that the "the play system has remained firmly in the same place where it was erected and has not been moved or relocated on a seasonal basis." (Internal quotation marks omitted.) Id., 721. On the basis of these findings, the court concluded that, although the play system was not anchored or cemented to the ground; id., 721 n.7; the play system constituted a permanent structure. Id., 721; see generally General Statutes § 7-147a (a) (defining "structure" under that statute as "any combination of materials, other than a building, which is affixed to the land, and shall include . . . signs, fences and walls"); *Historic District Commission* v. *Hall*, 282 Conn. 672, 683, 681, 923 A.2d 726 (2007) (construing in part § 7-147a and concluding that "objects need not be embedded in the ground to be deemed physically attached to the land" because "[t]here . . . can be no doubt that gravity may serve the . . . purpose of 'affixing' a very heavy object to the land"); *Capen* v. *Peckham*, 35 Conn. 88, 94 (1868) ("fences that are used to separate the lots of farmers are not let into the ground or [e]mbedded in the earth, so as to occasion injury to the soil by their removal . . . [but] no one could doubt that they are fixtures or

appurtenant to the realty").

In the present case, the court specifically found that "[t]he wall is large in size, is undoubtedly heavy and is immobile [but that] [i]ts stability and durability are less certain . . . ." The court also found that the portion of stone wall "along the Winchester Road side of the property is on or within a few feet of the border of the defendants' land and about [twenty] feet from the paved portion of Winchester Road. The wall has an average height of [three] feet with taller pillars on both sides of the driveway. The wall is topped by a decorative white fence of wood or plastic about 1.5 feet in height." Although not contained within the specific findings of the trial court, the evidence included photographs of the defendants' property also showing a large wooden gate attached to one of the stone pillars at the entrance to the driveway, which, when closed, would go across the driveway to attach to the other pillar. The survey maps state that the stone pillars are each six feet tall, and show that the stone wall extends across approximately two-thirds of the defendants' 300 feet of road frontage and also extends well beyond one hundred feet down the side of the defendants' property. On the basis of the court's findings and the uncontroverted evidence about the size of the wall, we conclude that the court erred in finding that the stone wall was not a permanent structure as that term is used in the defendants' deed.

The wall is approximately three feet high, with two large, six feet high stone pillars. There is a large wooden gate attached to one of the pillars, and a 1.5 foot fence that is attached to the top of the wall. The court found that the wall was large, heavy and immobile. The photographic evidence admitted at trial also shows that many of the rocks used in constructing this wall are quite large. Certainly, even if the court did not credit the evidence, both photographic and testimonial, that the wall had a concrete core, gravity would affix this wall, with its pillars and fencing, to the ground. Furthermore, there can be no doubt that the defendants intend for the wall to remain "firmly in the same place where it was erected and [not be] moved or relocated on a seasonal basis." (Internal quotation marks omitted.) *Zirinsky* v. *Carnegie Hill Capital Asset Management, LLC*, supra, 139 Conn. App. 721; cf. *Okemo Mountain, Inc.* v. *Ludlow Zoning Board of Adjustment*, 164 Vt. 447, 453, 671 A.2d 1263 (1995) (citing to R. Powell & P. Rohan, 3 Powell on Real Property [1994] § 34.21, pp. 34-264 and 34-265, for proposition that stone wall is permanent structure that could interfere with right of use of easement). Accordingly, we conclude that the court erred in determining that the stone wall was not a permanent structure that is prohibited by the clear language of the restrictive covenant contained in the defendants' deed.

II

The plaintiffs also claim that the court made clearly erroneous findings and that one of those findings, namely, that Harms drafted the deed, could have a binding precedential impact on other litigation in which the parties are involved. They contend that the court erred in finding that (1) the evidence did not demonstrate that the defendants' stone wall contains concrete and (2) the evidence demonstrated that Harms was the drafter of the defendants' deed without any input from the defendants. The finding regarding whether the stone wall contains concrete was discussed sufficiently for purposes of this appeal in part I of this opinion and need not be examined further, as it has no bearing on the outcome of this appeal. See, e.g., *Duplissie* v. *Devino*, 96 Conn. App. 673, 680 n.6, 902 A.2d 30 (declining to address disputed matter that was not necessary to outcome of appeal), cert. denied, 280 Conn. 916, 908 A.2d 536 (2006); *Bay Hill Construction, Inc.* v. *Waterbury*, 75 Conn. App. 832, 839, 818 A.2d 83 (2003) (declining to address issue not necessary to disposition of appeal). Additionally, although the plaintiffs challenge the court's finding that Harms drafted the deed without any input from the defendants, the correctness of this finding also is not relevant to our decision here, and, therefore, we decline to afford it review.[6] See *Bay Hill Construction, Inc.* v. *Waterbury*, supra, 839.

### III

The plaintiffs next claim that the court erred in declining to award punitive damages and costs on the basis of the defendants' intentional, wanton and malicious violations of their rights. They argue that the court's finding that the defendants' conduct was not wanton and malicious was clearly erroneous, and they request that we award punitive damages and costs on the basis of the defendants' conduct.[7] We are not persuaded.

"[T]he trial court has broad discretion in determining whether [punitive] damages are appropriate. . . . Its decision will not be disturbed on appeal absent a clear abuse of discretion. . . . Punitive damages are awarded when the evidence shows a reckless indifference to the rights of others or an intentional and wanton violation of those rights. . . . Punitive damages . . . in Connecticut are limited to attorney's fees less taxable costs . . . . Such damages, however, are not awarded as a matter of right, but rather as a matter of discretion, to be determined by the [court] upon a consideration of all the evidence . . . ." (Citation omitted; internal quotation marks omitted.) *Gleason* v. *Smolinski*, 149 Conn. App. 283, 313, 88 A.3d 589 (2014).

"Recklessness is a state of consciousness with reference to the consequences of one's acts. . . . It is more than negligence, more than gross negligence. . . . The state of mind amounting to recklessness may be inferred from conduct. But, in order to infer it, there

must be something more than a failure to exercise a reasonable degree of watchfulness to avoid danger to others or to take reasonable precautions to avoid injury to them. . . . Wanton misconduct is reckless misconduct. . . . It is such conduct as indicates a reckless disregard of the just rights or safety of others or of the consequences of the action. . . . Whether the defendant acted recklessly is a question of fact subject to the clearly erroneous standard of review." (Citation omitted; internal quotation marks omitted.) *Franc* v. *Bethel Holding Co.*, 73 Conn. App. 114, 137–38, 807 A.2d 519, cert. granted on other grounds, 262 Conn. 923, 812 A.2d 864 (2002) (appeal withdrawn October 21, 2003).

In the present case, the court specifically found that it did not "consider that the positions taken by the parties with respect to either the pole barn or the stone wall constitute intentional, wanton or malicious violations of the rights of the other parties." The plaintiffs in their brief argue that the court ignored certain evidence of the defendants' conduct before and during this case, and that this led to the court's alleged erroneous finding. We are not persuaded.

The trial court is in a far better position than are we to evaluate and weigh the evidence presented and to assess the credibility of the witnesses. There certainly is evidence in the record to support the court's finding that the defendants' actions were not reckless, and, although the plaintiffs point to other evidence in support of their position, we will not usurp the function of the trial court in weighing the evidence in order to make factual findings or in properly exercising its discretion.

The judgment is reversed only as to the court's finding that the defendants' construction of the stone wall did not violate the restrictive covenant prohibiting the erection of permanent structures within 100 feet of the westerly line of Winchester Road and the case is remanded with direction to render judgment for the plaintiffs on their request for injunctive relief requiring the defendants to remove all portions of the stone wall that are within 100 feet of the westerly line of Winchester Road. The judgment is affirmed in all other respects.

In this opinion the other judges concurred.

[1] Harms, an attorney, who also is a plaintiff in this case, filed an appellate appearance on behalf of herself and the other plaintiffs in this appeal. Luis Medina, a defendant in this case who also is an attorney, filed an appearance on behalf of himself and his wife, Amanda Medina. No issue regarding this dual representation has been raised by any party.

[2] The defendants also filed a late cross appeal from the portion of the court's judgment concerning the pole barn, which we dismissed as untimely.

[3] We further discuss this finding in part II of this opinion.

[4] We note that Michael Halloran, the Norfolk zoning enforcement officer, testified that a stone wall is not considered a structure under the Norfolk zoning regulations unless it is over six feet in height. Whether the wall would be considered a structure under the zoning regulations, however, has no bearing on whether the wall is a structure for purposes of the defendants' deed. "The responsibility of enforcing restrictive covenants in deeds is allocated to neighboring landowners, not to a municipal commission." *Moscow-*

*itz* v. *Planning & Zoning Commission*, 16 Conn. App. 303, 312 n.8, 547 A.2d 569 (1988). Here, the trial court specifically found that the wall "[o]bviously" was a structure under the language of the deed. That finding is not contested on appeal.

[5] We note that whether the stone wall would be in harmony with the area is not a relevant factor in evaluating whether it is a permanent structure. See *Zirinsky* v. *Carnegie Hill Capital Asset Management, LLC*, supra, 139 Conn. App. 720 (when evaluating whether structure is permanent, court should evaluate such factors as size, weight, durability, stability and mobility of structure).

[6] We also note that "[t]he fundamental principles underlying the doctrine [of collateral estoppel] are well established. Collateral estoppel, or issue preclusion, is that aspect of res judicata which prohibits the relitigation of an issue when that issue was actually litigated and necessarily determined in a prior action between the same parties upon a different claim. . . . For an issue to be subject to collateral estoppel, it must have been fully and fairly litigated in the first action. It also must have been actually decided and the decision must have been necessary to the judgment. . . . An issue is actually litigated if it is properly raised in the pleadings or otherwise, submitted for determination, and in fact determined. . . . An issue is necessarily determined if, in the absence of a determination of the issue, the judgment could not have been validly rendered. . . . If an issue has been determined, but the judgment is not dependent upon the determination of the issue, the parties may relitigate the issue in a subsequent action." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *R & R Pool & Patio, Inc.* v. *Zoning Board of Appeals*, 257 Conn. 456, 466, 778 A.2d 61 (2001).

[7] "In *Waterbury Petroleum Products, Inc.* v. *Canaan Oil & Fuel Co.*, [193 Conn. 208, 236, 477 A.2d 988 (1984)], we declined [an] invitation to stray from our well settled rule regarding the measurement of punitive damages. We affirmed the continuing viability of a long line of cases holding that common law punitive damages serve primarily to compensate the plaintiff for his injuries and, thus, are properly limited to the plaintiff's litigation expenses less taxable costs. . . . We recognized, moreover, that our rule, when viewed in the light of the increasing costs of litigation, also serves to punish and deter wrongful conduct. . . . In recent years, we have continued to adhere to the view that our traditional rule remains viable. . . . We remain convinced that a rule limiting punitive damages awards to the expenses of litigation less taxable costs fulfills the salutary purpose of fully compensating a victim for the harm inflicted on him while avoiding the potential for injustice which may result from the exercise of unfettered discretion by a jury." (Citations omitted; internal quotation marks omitted.) *Berry* v. *Loiseau*, 223 Conn. 786, 827, 614 A.2d 414 (1992).